# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 9, 2004

## GLADYS BOLES, ET AL. v. NATIONAL DEVELOPMENT COMPANY, INC., ET AL.

### Appeal from the Circuit Court for Hickman County
### No. 94-5027C     R. E. Lee Davies, Judge

---

### No. M2003-00971-COA-R3-CV - Filed April 26, 2005

---

This is a class action on behalf of purchasers of 3,876 lots at Hidden Valley Lakes Development, a residential development in Hickman County.  Plaintiffs seek to recover compensatory damages resulting from a breach of contract by the developer, National Development Company, Inc., and its alleged alter ego, Clyde W. Engle.  Plaintiffs allege that National breached its contract by failing to provide the centerpiece of the development, a thirty-acre lake.  The lake failed to hold water and thus became a thirty-acre hole in the ground.  It was stipulated that the failure of National to provide the thirty-acre lake was a breach of contract.  The trial was bifurcated into two phases.  The first was limited to the plaintiffs' claim for damages against National, following which the plaintiffs were awarded  compensatory damages in the amount of $2,540,867 against National.  The second phase of the trial was limited to the plaintiffs' claim that Clyde Engle was the alter ego of National and thus liable for the damages assessed against National.  Following an evidentiary hearing, the trial court pierced the corporate veil and held Engle personally liable for the judgment against National.  The defendants appeal contending that the plaintiffs' proof of damages was neither competent nor sufficient, that the wrong legal standard was applied to pierce the corporate veil and that the proof was insufficient to pierce the corporate veil.  Engle also appeals contending that the court did not have personal jurisdiction over him and thus the judgment against him is void.  Finding no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and Patricia J. Cottrell, J., joined.

John C. Hayworth, Charles Ingram Malone, Kathryn Hays Sasser, Gerald M. Tierney, Jr., and Joseph F. Welborn, Nashville, Tennessee, for the appellants, National Development Company, Inc., Sunstates Corporation and Clyde W. Engle.

Douglas Thompson Bates, III, Centerville, Tennessee, for the appellee, Gladys Boles, et al.

**OPINION**

Twenty-nine owners of property in the Hidden Valley Lakes Development in Hickman County, Tennessee, filed a civil action against National Development Company, Inc., a Texas corporation, seeking damages resulting from breach of contract and negligent and fraudulent misrepresentations. The principal complaint pertained to the centerpiece of the development, a thirty-acre lake, named Crystal Lake. The lake failed to hold water and it was subsequently determined that it would never hold water. Thus, instead of having a thirty-acre lake as the centerpiece of the development, the plaintiffs have a thirty-acre hole in the ground.

Plaintiffs amended their complaint in September 1995 to allege that their causes of action were being asserted on behalf of "all persons signing contracts with National prior to 1994 and specifically providing: 'THE SELLER is responsible for construction of roads, lakes, and related facilities'" and all successors to any persons who signed such contracts with National. The plaintiffs sought to represent a class of persons who purchased some 3,876 lots from National for a total consideration paid for the lots of $9,239,517.

In December of 1995, the trial court certified the plaintiffs' breach of contract claims as a class action on behalf of "persons who prior to the end of 1994, purchased or contracted to purchase property in the Hidden Valley Lakes subdivision from National Development Company, Inc., pursuant to contracts containing language to the effect that defendant would be responsible for construction of roads, lakes and related facilities." Plaintiffs' misrepresentation claims, however, were not certified for class action treatment. Thereafter, on February 20, 1996, the plaintiffs filed a notice of dismissal of their misrepresentation claims. Thus, the plaintiffs proceeded with their claim against National on the singular issue of whether National was liable for breach of contract based upon its failure to develop the centerpiece of the subdivision, Crystal Lake.

Later on, the plaintiffs again amended their complaint, adding Sunstates Corporation, National's parent, as an additional defendant. The thrust of the complaint against Sunstates was that it operated National as its "alter-ego, and as its agent." Plaintiffs alleged that Sunstates caused National to become under-capitalized as a result of a transfer on December 31, 1994 of an excess of $5 million in contracts to affiliates of Sunstates and National. Plaintiffs therefore alleged that Sunstates was liable for any judgment that may be rendered against National.

Two years later, in December of 1998, the plaintiffs amended their pleadings once again, this time adding Clyde W. Engle, the principal behind the corporate defendants, as an additional party defendant. Plaintiffs asserted that Engle exercised complete dominion and control over Sunstates, National and other affiliated entities and that he was the "alter-ego" of the entities which justified piercing the corporate veils of National and Sunstates in order to hold Engle individually liable for any judgments that may be rendered against the corporate defendants.

Due to the complexity of issues, the trial was bifurcated into two hearings. The first trial pertained to the issue of damages only. The second focused solely on the question of whether Engle

was the alter ego of the corporate defendants and, thus, whether the corporate veils should be pierced so that the plaintiffs could recover their damages against Clyde Engle, individually.

The damages portion of the plaintiffs' breach of contract action against National was tried before the Honorable Donald P. Harris on January 19, 2000. The plaintiffs were awarded damages against the developer, National, in the amount of $2,540,867. The second phase of the trial, to determine whether to hold Engle personally liable for the judgment against National, was tried before the Honorable R. E. Lee Davies on June 17 and 18, 2002. The trial court applied Tennessee law, rather than the law of the states of incorporation of National and Sunstates, and found Engle to be the alter ego of the corporate entities. It, therefore, pierced the corporate veils and held Engle personally liable for the $2,540,867 judgment rendered against National.

### STANDARD OF REVIEW

The issues raised constitute a challenge of the trial court's judgment following a bench trial. We review findings of fact by a trial court *de novo* and presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. We also give great weight to a trial court's determinations of credibility. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Parks Properties v. Maury County*, 70 S.W.3d 735, 742 (Tenn. Ct. App. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

### DAMAGES

Following a bench trial, the plaintiffs were awarded damages against National Development Company, Inc. the developer, in the amount of $2,540,867. Defendants appeal that decision, contending that the judgment against National should be reversed because the record does not contain competent or sufficient proof of damages. Our analysis of this issue begins with an assessment of the trial court's reasoning, which is set forth in detail in an excellent Memorandum Opinion:

This action for breach of contract was tried by the court on January 19, 2000. Plaintiffs are a class of purchasers of real property located in the Hidden Valley Lakes Subdivision, a recreational development, developed and marketed by the defendant, National Development Company, Inc. All members of the class purchased lots in the development incident to a contract of sale that contained the following language:

> "The SELLER is responsible for construction of roads, lakes and related facilities such as the bathhouse, beach and boat ramps, . . ."

The primary lake, Crystal Lake, intended to cover some 45 acres, was dug by the defendant but did not hold water and the effort to build the lake was finally abandoned. The plaintiffs brought a class action to recover for the diminution in value of their properties caused by the failure of the defendant to complete the lake. Five other small lakes were constructed by the defendant as well as a swimming pool, bathhouse and other facilities. Crystal Lake was, however, to be the preeminent recreational facility on the property and would have, if constructed, accommodated boating, skiing and fishing.

The concept of marketing the property was that anyone who purchased a lot in the development was entitled to use any of the common recreational facilities. Each landowner was obligated, by contract, to pay an assessment amounting to $72.00 per year to the homeowner's association for maintaining the property, to include the roads, sewers and sewage disposal facility, recreational facilities and common areas. By the end of 1994, some 3876 lots had been sold by the defendants and these lot owners are members of the class of plaintiffs. The total consideration paid by plaintiffs for their lots was $9,239,517.42.

The difficult question presented to the court is the amount of diminution in value of the lots sold caused by the defendant's failure to complete Crystal Lake. The defendant did not deny that it was obligated to construct the lake, that it failed to perform that obligation or that it was responsible for any diminution in value of the lots sold as a result. Some of the lots involved were larger lots suitable for construction of permanent dwellings. Some of the lots were very small lots suitable only for parking a camper. Some lots fronted directly on what was supposed to be Crystal Lake. Other lots were located in remote areas of the development nearer the small lakes.

By the time of the trial, it is clear that some of the lots had little, if any, value. Some 146 of them were sold by Hickman County for back taxes, evidencing abandonment by the persons who had purchased them. The vast majority of these

lots were retained by the county because no one offered any amount in excess of the taxes owed. The defendant itself had some lots for as little as $65.00.

When lots are abandoned in this development, the amount of maintenance fees that will be paid are proportionately reduced. Because many of the lots have little or no value, the ability of the homeowners' association to collect the maintenance fees has been eroded. Logically, this erosion would cause further uncertainty and diminution in value of the property.

Mrs. Polly Dyer, a real estate appraiser, testified as an expert for the plaintiffs. According to her testimony, the lots in the Hidden Valley Lakes Subdivision have diminished in value an average of ninety (90%) percent for those lots fronting on the proposed Crystal Lake and sixty (60%) for those not fronting on the proposed lake. She opined that ninety (90%) of the diminution in value was caused by the failure of defendant to complete Crystal Lake.

On cross-examination, Mrs. Dyer listed the resales of lots in Hidden Valley Lakes Subdivision as derived from records maintained by the Assessor of Properties Office for Hickman County. Based upon the resales, one-half of the lots resold had diminished in value sixty (60%) or less. One-half of the lots resold had diminished greater than sixty (60%) percent. These figures would indicate half the lots resold lost an average of thirty (30%) percent in value and half lost an average of eighty (80%) percent in value. As a whole, the value received for the lots upon resale decreased an average of fifty-five (55%) percent.

Certainly, the failure of the defendant to complete Crystal Lake and the fallout from that failure diminished the value of the lots in the subdivision. While failure to complete the lake was the only circumstance shown to have had an effect on the devaluation of the lots, other factors such as a loss of interest, lack of marketing expertise and unwillingness to incur expenses involved in marketing the lots may also have had some effect. Recognizing the burden is on the plaintiffs to prove the amount of their damages caused by the breach, the court finds, by a preponderance of the evidence, that fifty (50%) percent of the diminution in value was caused by the failure of the defendant, National Development Company, Inc., to complete the construction of Crystal Lake.

Accordingly, plaintiffs shall have a judgment against National Development Company, Inc., for twenty-seven and one-half (27½%) percent of $9,239,517.42, the total consideration paid by the plaintiffs for their properties. The total amount of the judgment shall be $2,540,867.29.

The court further finds there is no rational basis for finding some lots in the development were damaged more than others. It is noted that the lots fronting on the

proposed Crystal Lake were larger lots suitable for construction of permanent dwellings. As such, they had value separate from their proximity of Crystal Lake. The small camper lots had value only because of their location in the development and their proximity to the recreational facilities located there, including Crystal Lake. As a consequence, the court finds the damages awarded should be apportioned to each lot owner on the basis of the amount of consideration paid.

One of the defendants' contentions is that the plaintiffs' expert witness, Polly Dyer, was not qualified to render an opinion concerning the value of the real estate at Hidden Valley Lakes or the diminution in the value of the property. The record reveals that Ms. Dyer had been a resident of Hickman County for many years, that she had been actively involved in the real estate business in Hickman County for over twenty years, since 1978, and that she had appraised real estate in the county on a continuous basis since 1991. She had served on the State Board of Appraisers for seven years at the time of the first trial. Moreover, on multiple occasions she had been recognized as an expert witness, qualified to render opinions as to the value of real property, by the Circuit and Chancery Courts for Hickman County.

The rules of evidence that govern the issue of admissibility of expert testimony are Tenn. R. Evid. 702 and 703. The trial court has the initial responsibility to find whether the purported expert evidence will substantially assist the finder of fact to understand the evidence and to determine a fact at issue. *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). On appeal, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are generally left to the discretion of the trial court. *McDaniel*, 955 S.W.2d at 263 (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused. *McDaniel*, 955 S.W.2d at 264.

Considering the foregoing, we find no error with the trial court's decision to qualify Ms. Dyer as an expert witness competent to render opinions concerning the value of real estate and the diminution of the value of the real estate at issue.

We now turn our attention to the evidence that was introduced concerning the plaintiffs' damages. It was undisputed that Crystal Lake, the centerpiece of the development, did not hold water and would never hold water, thus there was nothing more than a massive, thirty-acre hole in the ground in the center of the development.

The evidence Ms. Dyer introduced can be summed up as follows: the lots in Hidden Valley Lakes were purchased for recreational purposes, as second homes as distinguished from primary residences; the center piece of the development was the proposed thirty-acre Crystal Lake; the lots at Hidden Valley Lakes dramatically diminished in value once the public became aware that Crystal Lake would never hold water; that 90% of the overall diminution in value of the lots was due to the failed Crystal Lake; and that the lots diminished in value from their original value within a range from 60% to 90%, with the diminution in value increasing with the proximity to the failed Crystal Lake.

The plaintiffs introduced additional evidence of the diminution of value to the lots through the testimony and records of the Clerk and Master of the Chancery Court for Hickman County, Sue Smith. Ms. Smith introduced evidence establishing that 179 of the lots at Hidden Valley Lakes had been sold by the county at tax sales between 1994 and 1997 due to the failure of property owners to pay their property taxes. Of these, 133 had been purchased by the county for the amount of the taxes and another 46 had been purchased by individuals, also for the amount of the taxes.

While the defendants take exception with the sufficiency of the plaintiffs' evidence, they did not introduce any evidence concerning the value of the lots. Thus, the plaintiffs' evidence of the diminution of value of the lots at Hidden Valley Lakes was uncontroverted.

Considering the foregoing, we find no error with the trial court's decision to recognize Ms. Dyer as an expert witness. Furthermore, we find that the evidence does not preponderate against the trial court's findings as to damages. Therefore, we affirm the judgment of $2,540,867 against National Development Company, Inc.

### PIERCING THE CORPORATE VEIL

The second hearing was limited to the issue of whether Clyde Engle was the alter ego of National Development Company, Inc. and Sunstates Corporation. Following an evidentiary hearing, the trial court found Clyde Engle to be the alter ego of the corporate entities and held him liable for the $2,540,867 judgment.

The defendants appeal this ruling asserting that the trial court committed two primary errors. First, the defendants contend that the trial court erred by applying the law of Tennessee to determine whether to pierce the corporate veils of National and Sunstates. They contend the court should have applied the law of the states of incorporation of National and SunStates, being Texas and Delaware, respectively, instead of Tennessee law, and that this alleged error was significant because the plaintiffs provided no proof of actual fraud, which Texas and Delaware require.[1] Second, the defendants contend that the evidence was insufficient, even under Tennessee law, to justify piercing the corporate veil.

#### CHOICE OF LAW ARGUMENT

The contention that the trial court erred by applying Tennessee law, instead of the law of Texas and Delaware, to determine whether to pierce the corporate veil is without merit. This court previously applied Tennessee law to pierce the corporate veil of a foreign corporation and to hold its principal liable for the debts of the corporation in *Oceanics Schools, Inc. v. Barbour,* 112 S.W.3d 135 (Tenn. Ct. App. 2003).

---

[1]Tennessee's burden of proof, though substantial, does not require proof of actual fraud.

*Oceanics* arose out of a prior civil action wherein Oceanics Schools, Inc. (hereinafter "plaintiff") obtained a judgment ("the OSC judgment") against Operation Sea Cruise, Inc. (OSC).[2] Upon discovering that Operation Sea Cruise, Inc. was insolvent, the plaintiff filed a second action to enforce the OSC judgment against Clifford E. Barbour, Jr., whom the plaintiff alleged was the alter ego of OCS. The trial court, applying Tennessee law, found that Barbour was the alter ego of OSC and pierced the corporate veil to enforce the OSC judgment against Barbour.

Not unlike the case at bar, *Oceanics* comprised two trials. The first was limited to damages, and the plaintiff was awarded a judgment for damages against the corporate defendant. The second trial was limited to the issue of whether Clifford Barbour, the principal behind OSC, was the judgment debtor's alter ego. The second trial was tried against the backdrop of a long and unusual history, the pertinent parts of which are as follows.

> [Barbour] formed [OSC], under the laws of Panama in 1965 for the purpose of acquiring ownership of, repairing, and operating the sailing vessel "Antarna." Barbour owned 100 percent of the shares of OSC, which purchased the sailing ship in 1967 and extensively repaired and restored it. In 1971, [the plaintiff] chartered the Antarna from [OSC] for use as a school ship in exchange for [the plaintiff's] providing repairs and supplies to make the vessel operational.

> [The plaintiff] invested approximately $630,000 in repairs and supplies for the Antarna and began using the vessel in its school program. In March 1972 [OSC] reclaimed possession of the vessel in the Panama Canal Zone and subsequently sold the Antarna to a third party, [footnote omitted] who sailed the ship out of Panamanian waters to the Azores, Portugal. The proceeds of that sale were paid by [OSC] to Barbour in repayment of "a portion of the loans to the corporation by [Barbour]."

> [The plaintiff] filed suit against [OSC] and the vessel by Writ of Attachment in the District Court of Ponta Delgada, Azores, Portugal, for breach of contract and obtained a judgment against [OSC] for $929,815.55 plus interest. [footnote omitted] That Court then issued a Rogatory Letter to the Circuit Court for Knox County, Tennessee for seizure of properties of [OSC] or any other persons as may be liable for the obligations of [OSC], and apparently identifying [Barbour], Dorothy Drake Barbour and David Barbour as directors and managers of [OSC].

*Oceanics*, 112 S.W.3d at 137.

The second action was commenced in the Knox County Circuit Court to domesticate the Portuguese Judgment. The Portuguese Judgment against OSC was domesticated by the Knox

---

[2]*Oceanics Schs., Inc. v. Operation Sea Cruise, Inc*., No. 03A01-9904-CV-00153, 1999 WL 1059678 (Tenn. Ct. App. Nov. 19, 1999).

County Circuit Court. After discovering that the corporate defendant had no assets, the plaintiff amended the complaint to add Clifford Barbour individually as a party-defendant, alleging that Barbour, the principal shareholder of OSC, failed to adequately capitalize the corporation, made personal loans to the corporation to gain an unlawful preference as a purported creditor over future creditors, and failed to observe corporate formalities. In short, the plaintiff claimed that OSC was the alter ego of Barbour, that the corporate veil should be pierced, and that Barbour was liable for the judgment against OSC.

Like the case at bar, the individual defendant Clifford Barbour argued, *inter alia*, that the plaintiff's action to pierce the corporate veil of OSC should be governed by the laws of the country of Panama, the jurisdiction where the corporation was chartered. The trial court disagreed, applied the law of Tennessee and held that Clifford Barbour was the alter ego of OSC and "should be personally bound on the judgment in favor of the Plaintiff against OSC." Barbour appealed. This court affirmed, finding that Tennessee law was properly applied and sustained the finding that Barbour was the alter ego of the defendant corporation. As for the choice of law argument, the *Oceanics* court opined,

> We find no merit in Barbour's assertion that Panamanian law is relevant on the question of whether the corporate veil can be pierced in this case. We are dealing now with a Tennessee judgment. The law of Tennessee is applicable in determining the efficacy and parameters of the piercing of the corporate veil theory.

*Oceanics,* 112 S.W.3d at 146.

Like *Oceanics*, we too are dealing with a Tennessee judgment against a foreign corporation and the question of whether to pierce the veil of a foreign corporation to hold its principal liable. Therefore, we find the defendants' contention that the trial court erred by not applying the law of Texas and Delaware, the states of incorporation of the corporate defendants, to be without merit.

SUFFICIENCY OF THE EVIDENCE

The defendants contend that the evidence was insufficient to justify piercing the corporate veil. The evidence in the record was greatly impacted by sanctions imposed against Clyde Engle and the corporate defendants for obstructing discovery. Thus, we begin our analysis of the sufficiency of the evidence with an analysis of the propriety of the sanctions imposed by the trial court. The sanctions imposed and the trial court's justification for imposing the sanctions are set forth in an order, which reads as follows:

> This cause is before the court upon a motion for sanctions filed by the plaintiffs and a motion to dismiss filed by the defendant, Clyde Engle. The court earlier denied a motion to dismiss the case against Mr. Engle for lack of personal jurisdiction on the ground the amended complaint alleged a sufficient factual basis for this court to exercise its jurisdiction. During that hearing, the court indicated that

after the defendant had submitted to discovery, defendant could renew his motion. The court also has, on two occasions, ordered Mr. Engle to respond, in discovery, to all queries relating to all corporations in which he has or has had an interest and to all corporations in which those corporations has or has had [sic] an interest.

The gravaman of the complaint, as the court understands it, is that the defendant, Clyde Engle, caused the National Development Company, Inc. and Sunstates Corporation to make a fraudulent transfer of assets, totaling $5,116,720.00, in order to defraud creditors of those corporations relating to transactions that occurred in Tennessee. According to the amended complaint, this transfer was made to an affiliate corporation controlled by Mr. Engle for his personal benefit.

Queries relating to Mr. Engle's corporate affiliations relate not only to the accuracy of plaintiff's claims but also to whether there is a sufficient connection between him, corporations in which he has a direct or indirect interest and the defendants, National Development Company, Inc., and Sunstates Corporation, for this court to exercise personal jurisdiction. Absent his personal response to questions relevant to this subject matter, the court must, as previously, rely upon the allegations of the amended complaint.

Despite being twice ordered to do so, the defendant, Clyde Engle, has continued to refuse to answer questions related to his corporate affiliations and, moreover, has renewed his motion to dismiss the amended complaint for lack of personal jurisdiction. The motion to dismiss is denied. The motion for sanctions is granted.

It is, therefore, ORDERED as follows:

1. Defendant, Clyde Engle, is estopped from asserting this court lacks personal jurisdiction of him.

2. The corporate chart plaintiffs aver was presented by Rick Leonard, Operations Officer of National Development Company, Inc., shall be admissible during the trial of this case as evidence of the affiliation of corporations in which the defendant, Cyde Engle, has an interest. The defendant, Clyde Engle, will be prohibited from presenting contrary evidence.

3. During the trial of this case, transactions and dealings between the defendant, Clyde Engle, RDIS Corporation, Telco Capital Corporation, Hickory Furniture Company, Wisconsin Real Estate Investment Trust, Indiana Financial Investors, Inc., Sunstates Corporation and National Development Company, Inc., shall be considered typical of Clyde Engle's transactions and dealings with other affiliated corporations as identified by the chart referred to herein.

4. Plaintiffs are awarded an attorney's fee of Two Thousand Five Hundred ($2500.00) Dollars for the prior motions to compel and for obtaining this order. They shall have judgment against Clyde Engle in that amount.

Tenn. R. Civ. P. 37.02 empowers a court to impose sanctions when "a deponent; a party; an officer, director, or managing agent of a party . . . fails to obey an order to provide or permit discovery, including an order made under Rule 37.01 or Rule 35, or if a party fails to obey an order entered under Rule 26.06, the court in which the action is pending may make such orders in regard to the failure as are just, . . ." The sanctions available to the court include the following:

(A) *An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order*;

(B) *An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence*;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders . . . ;
. . . .

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Tenn. R. Civ. P. 37.02 (emphasis added).

While the plaintiffs' discovery efforts were not Herculean, they were substantial and were met with numerous and significant hurdles strategically placed by Engle. Though the following is not a complete history of the plaintiffs' efforts to obtain discovery, it is a fair representation of the pertinent facts. More importantly, it is the primary basis for the trial court's decision to impose sanctions. It is the affidavit of the plaintiffs' counsel which was attached to the plaintiffs' memorandum in support of their motion for sanctions. The affidavit reads as follows:

Douglas Thompson Bates, III, does state the following upon his oath:

For two and one-half years, the Class has been attempting to use the lawful discovery procedures to discover evidence to present to the Court concerning the elaborate family of corporations of Clyde Engle. What follows is a chronology of our efforts.

1.  During the settlement negotiations, which resulted in a settlement disapproved by the Court, Rick Leonard, an officer of National Development Company (hereinafter referred to as NDC) and active in the negotiations of settlement (he had flown from Raleigh, North Carolina, for the trial), showed me a chart which looked very similar (it might have been exactly like) the one below. Moreover, I had been furnished a series of charts from Coronet Insurance, an Engle subsidiary. Here is what the chart looked like:

    [chart - see Addendum]

2.  After the Court disapproved the settlement, we embarked upon the two and one-half year journey of attempting to get a focus of the corporate schedule headed by Clyde Engle owner of 80% of RDIS, the head of the scheme.

3.  Noting that Sunstates owned 100% of NDC, that Sunstates was a defendant, and that Sunstates seemed to be at a vortex of the scheme, on June 10, 1998, we took the deposition of Lee Mortensen, whose business card proclaimed as follows: [card omitted; it identified Lee N. Mortenson as President and Chief Operating Officer of "Sunstates"] In the deposition, Mr. Mortensen conceded that, "I don't know what Sunstates owns and what it does not own" (p. 12). And when I attempted to inquire about what other corporations he had knowledge of, Mr. Alexis, who had been relieved as counsel, objected.

4.  Then, on that same day, Mr. Engle's deposition was taken. Rick Leonard, chief operating officer of NDC was present and was also acting as Mr. Engle's counsel. Leonard said he did not recall the chart (p. 34). Throughout the remainder of the deposition, Mr. Alexis and Mr. Engle protested as I asked about other corporations owned by Engle directly or indirectly.

5.  On Dec. 18, 1998, I filed interrogatories inquiring of all corporations as to all corporations which Clyde Engle had an interest in.

6.  In August 1998, Neal Lovlace asked for a protective order.

7.  On May 18, 1999, Engle was ordered to "respond fully to the interrogatories and request to produce documents filed by the plaintiffs no later than June 28, 1999."

8. On July 23, 1999, Engle filed a response mentioning seven corporations, submitting SEC 10-Q's for two of them, and disavowing any knowledge of charts of ownership.

9. On August 24, 1999 acting on my motion, the Court ordered Mr. Engle to answer the interrogatories and request to produce as, "as to all corporation Engle has an interest in or corporations those corporations had an interest in." If complied with, the discovery would have been complete.

10. But, on Sept. 7, 1999, Engle filed his second response and furnished information on 12 companies.

11. Now, in the meantime, I was trying to get Mr. Engle's deposition done.

   (a) In its order of May 18, 1999, the Court had ordered that Engle would submit to a deposition in Centerville when Judge Harris was present to [sic] his evasion could be tended to immediately.

   (b) The depositions were continued twice; once because of the surgery of my secretary's daughter; and another time because of the surgery of Mr. Lovlace's wife.

   (c) In the meantime, I addressed to Mr. Lovlace the inadequacies of Engle's response by letter of August 18, 2000. In the letter I stated:

   > "I believe if Mr. Lovlace will review the last order from Aug. 24, 1999, he will see Mr. Engle's requirement is to answer fully insofar as corporations he has an interest in or corporations that his corporation has an interest in. Although he has failed to do that, before asking for sanctions, I am going to give him and Mr. Tierney an opportunity to answer these questions in a depositions. If they continue to fail to do so, after this process, I shall apply for the ultimate sanction of holding Mr. Engle liable for NDC debt judgment."

   (d) Then, Mr. Lovlace informed me that Engle could not fly for doctor's reasons. I responded by a letter dated Oct. 10, 2000, which said:

   October 10, 2000

   Hon. Neal Lovlace
   Attorney at Law
   820 Hwy. 100
   Centerville, TN 37033

   RE:   BAILET et al vs. N.D.C., et al
         HICKMAN CIRCUIT NO. 94-5027C

-13-

Dear Neal:

. . . .

Insofar as where we are going to take the depositions: If I receive a letter from a doctor telling me that it would be dangerous to Clyde Engle's health for him to fly; and in addition to that, a signed authorization from Mr. Engle that I can receive medical information from that doctor and I receive those on or before Oct. 25, 2000, I will go to Chicago and take those depositions so long as the plane trip and hotel accommodations are in place ten days before the trip. If I have not received the letter of authorization by Oct. 25, we will do both depositions in Centerville. Please tell your client that I am not giving on these deadlines for anything except a personal concern of yours.

. . . .

(e) I received no such letter or authorization and so I assumed the deposition would take place in Centerville on Dec. 11. However, in early December, Mr. Lovlace informed me that he had made arrangements for us to fly to Chicago and stay there for the depositions. I decided I would at least try to take them; and as we went to Nashville that Sunday, Dec. 10, Mr. Lovlace presented me with a letter dated Dec. 5, 2000, (my deadline was Oct. 25), which reads as follows:

RHEUMATOLOGY ASSOCIATES, S.C.

. . . .

December 5, 2000

PERSONAL AND CONFIDENTIAL
To Whom It May Concern:

Mr. Clyde Wm. Engle has been a patient of this office for approximately ten years.

He was diagnosed with a condition in September, following an episode for which he was hospitalized. Tests are being conducted to determine appropriate treatment and the extent of any related problems.

-14-

As a result of the condition, he is prohibited from operating motor vehicles and is strongly urged not to involve himself in stressful situations nor to fly except with full precautions and accompaniment by knowledgeable personnel.

Sincerely,
Robert S. Katz, M.D.

In the deposition, I inquired of Engle's health and the following question and answer took place:

Q: What is your health condition that you would not be able to travel?
A: That's clearly not relevant to this deposition, and not something I'm going to answer on the record.
Q: I will ask you to instruct your client to answer.
A: (Mr. Tierney) No, I will not.

Later:

Mr. Bates: Will you tell him to authorize me to talk to the doctor?
Mr. Tierney: No.

Back home in Centerville, I asked by interrogatory whether Engle had flown in an airplane from Dec. 1, 2000 to Jan. 31, 2001. (Interrogatory Two filed on Feb. 2, 2001.) He refused to answer. (Answer Two filed on April 7, 2001.)

So, Engle had avoided the Court for his deposition.

12. Now, remember my letter to Mr. Lovlace concerning the inadequacies of Engle's responses and that I would give him a chance to correct them at the deposition. But, please consider his responses in Chicago away from the Court's scrutiny. Attached at the end of this Affidavit are three pages of copies of the condensed depositions.

13. Thus, Engle has been ordered twice to fully disclose his corporate scheme, was warned by Counsel that if he did not in his deposition, we would ask for the ultimate sanction, and although he has avoided facing this judge in person, he has not complied with the orders of this Court.

14. Insofar as the charts, Engle has now presented charts which Mr. Leonard, officer of Sunstates and NDC "to which he referred." Engle says he has

-15-

never seen them. A copy of one of the charts they have furnished is on the next page of this Affidavit.

[see Addendum]

15. Although counsel has been unable to discover the true picture of Engle's vast net worth of corporations, still, some things have been established.

(a) We know that Sunstates purchased 1.8 million dollars worth of jewelry and art, which are maintained at the home of Clyde Engle. (Notice of Annual Stockholder meeting. Sunstates 1998.)

(b) We know that a subsidiary of a subsidiary of an indirect subsidiary of Sunstates purchased a Rolls Royce for "corporate use." (Interrogatories answered April 7, 2001.)

(c) From financial data furnished us from answers to interrogatories, we can show the ownership from Engle to Sunstates in 1995 as follows:

[chart omitted]

(d) And we can see the massive losses each corporation up to RDIS, the corporation through which Engle controls the family.

THE FINANCIAL STRENGTH OF THE
CHAIN FROM CLYDE ENGLE TO NDC

1. Clyde Engle (refuses to answer any questions concerning this)
2. RDIS – We have no financial statement since 1989.
3. Telco – We have a 1992 statement which reveals: $13,224,000 invested in affiliates; $23,404,000 received from affiliates; and a stockholder deficit of $21,652,000.
4. Hickory Furniture – We have a 1994 statement which reveals: $3,032,000 invested in affiliates; $2,942,000 receivables from affiliates; and $42,644,000 receivables from parent. In other words: 42 million dollars has been funneled up the stream to Engle.
5. Wisconsin REIT – We have a 1995 statement which shows stockholders equity at $22,803,000 LOSS and $8,668,000 in receivables from affiliate.
6. NRG – We have a 1999 statement showing retained earnings of $2,590,837 LOSS and $1,979,320 in receivable from sole stockholder (Clyde Engle).
7. Indiana Financial Investors – We have a report 1999 showing receivables from affiliates of $12,623,237.

8. NDC – We have a report from 1997 showing due from affiliates $9,544,790.

9. Sunstates – We have a 1997 report showing Accumulated Deficit $48,304,274; receivable from affiliates $2,681,315; and investments in affiliates $10,771,318.

(e) We have been furnished credit advices showing intercompany transfers from 1994 to 1999. Kristi Tinin has spent many hours compiling these; and although she has the figures, she would rather check them more carefully before stating them under oath. But she can confidently say that Engle has been advanced approximately $4 million dollars from Libco (former name of RDIS); approximately $2 million dollars from Telco; and approximately $5 million dollars from Hickory Furniture.

(f) We have many dates showing money "laundering" between these corporations, such as:

1. On 12/22/95 Sunstates transferred $100,000.00 to Hickory Furniture, which on that same day transferred $100,000.00 to Clyde Engle.

2. On 5/1/95, Sunstates transferred $357,750.00 to Hickory Furniture, which transferred $325,000.00 to Clyde Engle.

3. On 4/19/94, Sunstates transferred $396,250.00 to Hickory Furniture, which on that same day transferred $400,000.00 to Clyde Engle.

(Credit advices in box held at Clerk's Office.)

(g) We know from NDC's Financial Statements that from 1990 to 1996, $6,422,338.00 flowed to its parent. This does not count the transfer of over $2,000,000.00 of receivables while this case has been pending.

16. The undersigned does not believe that any order by this Court will be effective to have Engle complete the picture of his vast network of corporations.

17. I am sure I have spent 100 hours on the discovery in the last two and one-half years. I cannot say it has all been fruitless, but one-half of it has been caused by Engle's obstructions.

_____/S/_____
DOUGLAS THOMPSON BATES, III
ATTORNEY FOR PLAINTIFFS

[jurat omitted]

Though Engle and the corporate defendants contradicted some of the facts represented in the foregoing affidavit, the plaintiffs' discovery efforts were repeatedly and materially obstructed by Engle. Moreover, the court ordered Engle on two occasions to submit to discovery, yet Engle did

not comply. Tenn. R. Civ. P. 37.02 primarily applies to sanctions for non-compliance with a court order. *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 698-99 (Tenn. 1988); *see also Mercer v. Vanderbilt University Inc*., 134 S.W.3d 121, 133 (Tenn. 2004). Wide discretion is afforded to the trial courts to determine the appropriate sanction. *Id*. at 133. Although "reasonable judicial minds can differ concerning [its] soundness," the trial court's determination of the appropriate sanction will be set aside only where the court "has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *Alexander v. Jackson Radiology Associates, P.A.,* 156 S.W.3d 11, 15 (Tenn. Ct. App. 2004) (quoting *White v. Vanderbilt Univ*., 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). The sanction, i.e., punishment, must fit the offense. *Id*. at 15.

Considering the foregoing, we find no error with the sanctions imposed by the trial court.

IS NATIONAL THE ALTER EGO OF CLYDE ENGLE?

An excellent discussion of the relevant factors to consider is found in *VP Buildings, Inc. v. Polygon Group*, No. M2001-00613-COA-R3-CV, 2002 WL 15634, *4-5 (Tenn. Ct. App. January 8, 2002).

> Conditions under which the corporate entity will be disregarded vary according to the circumstances present in the case, and the matter is particularly within the province of the trial court. *Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc*., 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995) (citing *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp*., 691 S.W.2d 522 (Tenn.1985)); *Piper v. Andrews*, No. 01A01-9612-CV-00570, 1997 WL 772127, at *3 (Tenn. Ct. App. Dec. 17, 1997) (Perm. app. denied June 8, 1998). Thus, the question of when an individual should be held liable for corporate obligations is largely a factual one. "Each case involving disregard of the corporate entity must rest upon its special facts." *Muroll Gesellschaft*, 908 S.W.2d at 213; *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991).
>
> . . . .
>
> There is a presumption that a corporation is a distinct legal entity, wholly separate and apart from its shareholders, officers, directors, or affiliated corporations. In an appropriate case and in furtherance of the ends of justice, the separate identity of a corporation may be discarded and the individual or individuals owning all its stock and assets will be treated as identical to the corporation. *Muroll Gesellschaft*, 908 S.W.2d at 213; *Schlater*, 833 S.W.2d at 925; *see also Fidelity Trust Co. v. Service Laundry Co.*, 160 Tenn. 57, 61, 22 S.W.2d 6, 7-8 (1929); *see generally E.O Bailey & Co. v. Union Planters Title Guar. Co.*, 33 Tenn.App. 439, 232 S.W.2d 309 (1950). Discarding the fiction of the corporate entity, or piercing the corporate veil, is appropriate when the corporation is liable for a debt but is without funds to pay the debt, and the lack of funds is due to some misconduct on the part of the officers and

-18-

directors. *Muroll Gesellschaft*, 908 S.W.2d at 213; *S.E.A., Inc. v. Southside Leasing Co., et al.*, No. E2000-00631-COA-R3-CV, 2000 WL 1449852, at *9 (Tenn. Ct. App. Sept. 29, 2000) (no Tenn. R.App. P. 11 filed); *Emergicare Consultants, Inc. v. Woolbright*, No. W1998-00659-COA-R3- CV, 2000 WL 1897350, at *2 (Tenn. Ct. App. Dec. 29, 2000) (Perm. app. denied. May 14, 2001).

In those circumstances, courts may pierce the corporate veil to find the "true owners of the entity" liable, *Murroll Gesellschaft*, 908 S.W.2d at 213, or "to impose liability against a controlling shareholder who has used the corporate entity to avoid his legal obligations." *Manufacturers Consolidation Serv., Inc. v. Rodell*, 42 S.W.3d 846, 866 (Tenn. Ct. App. 2000). Our courts will disregard the corporation as a separate entity upon a showing that the corporation is a sham or dummy or such action is necessary to accomplish justice. [footnote omitted] *Muroll Gesellschaft*, 908 S.W.2d at 213; *Tennessee Racquetball Investors, Ltd. v. Bell*, 709 S.W.2d 617, 619 (Tenn. Ct. App.1986); *Oak Ridge Auto Repair Serv. v. City Fin. Co.*, 57 Tenn. App. 707, 711, 425 S.W.2d 620, 622 (1967); *Fidelity Trust Co.*, 160 Tenn. at 61, 22 S.W.2d at 7- 8; *Emergicare Consultants, Inc*., 2000 WL 1897350, at *2; *Piper*, 1997 WL 772127, at *3.
. . . .

Some factors the court considers in determining whether to pierce the corporate veil are whether the corporation was grossly undercapitalized, the nonissuance of stock certificates, the sole ownership of stock by one individual, the use of the corporation as an instrumentality or business conduit for an individual or another corporation, the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, the use of the corporation as a subterfuge in illegal transactions, the formation and use of the corporation to transfer to it the existing liability of another person or entity, and the failure to maintain arms length relationships among entities. *Emergicare Consultants, Inc*., 2000 WL 1897350, at *2 (citing *Federal Deposit Ins. Corp. v. Allen*, 584 F.Supp. 386 (E.D. Tenn. 1984)).

*VP Buildings,* 2002 WL 15634, at *4-5.

The *Oceanics* opinion, discussed in detail earlier, also provides a blueprint of factors that may be considered when determining whether to pierce the corporate veil. As we learn from *Oceanics*, one starts with the premise that "[a] corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors." *Oceanics*, 112 S.W.3d at 140 (quoting *Schlater v. Haynie*, 833 S.W.2d at 925. However, a corporation's separate identity may be disregarded or pierced "upon a showing that it is a sham or a dummy or where necessary to accomplish justice." *Oceanics,* 112 S.W.3d at 140 (citing *Schlater*, 833 S.W.3d at 925). A corporation's identity should be disregarded "with great caution and not precipitately." *Schlater*, 833 S.W.2d at 925. Whether to disregard the corporate fiction depends on the special circumstances of each case, *Oceanics,* 112 S.W.3d at 140, and "the matter is particularly within the province of the trial court." *Electric Power*

*Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985). No one factor is conclusive in determining whether or not to disregard a corporate entity; rather, courts should rely upon a combination of factors in deciding such an issue. *Schlater*, 833 S.W.2d at 925 (citing 18 Am.Jur.2d Corporations § 48, p. 847, n. 41-42 (1985)).

This court has also relied upon the so-called *Allen* factors stated in *Federal Deposit Ins. Corp. v. Allen*, 584 F.Supp. 386 (E.D. Tenn.1984):

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Id*. at 397 (citations omitted), also cited in *Greene v. Hill Home Dev. Inc*., CA No. 03A01-9210-CH-00369, 1993 WL 17115, at *2 (Tenn. Ct. App. Jan. 28, 1993).

It is most important to note that it is not necessary that all of the *Allen* factors weigh in a plaintiff's favor in order to justify the piercing of the corporate veil. *Oceanics,* 112 S.W.3d at 140-141 (citing *In re B & L Laboratories, Inc*., 62 B.R. 494, 504 (Bankr. M.D. Tenn.1986) (holding that "all of these factors need not be present to justify disregard of the corporate boundaries; however, it is necessary that substantial equities favor the aggressor party.")).

We now look to the findings by the trial court. Following the second evidentiary hearing, the trial court entered a second Memorandum Opinion which provides an extensive recitation of the court's findings:

## MEMORANDUM OPINION

> This is the second phase of a two part trial involving these parties. In the first phase, the Court entered a judgment in favor of the plaintiffs for $2,540,867.29 against defendant National Development Corporation. The second phase concerns the doctrine of piercing the corporate veil in order to reach the parent corporation, Sunstates and/or Clyde Engle, who was added as a party defendant in January of 1999.

As the plaintiffs proceeded with their discovery during the second phase, Mr. Engle responded by engaging in a pattern of obstruction and delay. Judge Donald Harris, who presided over the initial phase, ultimately entered an order estopping Mr. Engle from denying this Court's jurisdiction over his person. In particular Judge Harris made the following findings:

> Queries relating to Mr. Engle's corporate affiliations relate not only to the accuracy of plaintiffs' claims but also to whether there is a sufficient connection between him, corporations in which he has a direct or indirect interest and the defendants National Development Company, Inc. and Sunstates Corporation, for this Court to exercise personal jurisdiction. Absent his personal response to questions relevant to this subject matter, the Court must, as previously, rely upon the allegations of the amended complaint.

> Despite being twice ordered to do so, the defendant, Clyde Engle, has continued to refuse to answer questions related to his corporate affiliations and, moreover, has renewed his motion to dismiss the amended complaint for lack of personal jurisdiction. . . .
> The corporate chart plaintiffs aver was presented by Rick Leonard, operations officer of National Development Company, Inc. shall be admissible during the trial of this case as evidence of the affiliation of corporations in which the defendant, Clyde Engle, has an interest. The defendant, Clyde Engle, will be prohibited from presenting contrary evidence.

> During the trial of this case, transactions and dealings between the defendant, Clyde Engle, or DIS Corporation, Telco Capital Corporation, Hickory Furniture Company, Wisconsin Real Estate Investment Trust, Indiana Financial Investors, Inc., Sunstates Corporation and National Development Company, Inc., shall be considered typical of Clyde Engle's transactions and dealings with other affiliated corporations as identified by the chart referred to herein (See order of August 28, 2001).

. . . .

The issue before this Court is whether plaintiff has made out a case for piercing the corporate veil as to (1) Sunstates Corporation and/or (2) Clyde Engle.
 . . . .

-21-

## PIERCING THE CORPORATE VEIL

Conditions under which the corporate entity will be disregarded vary according to the circumstances present in the case, and is an issue which the courts have recognized is particularly within the province of the trial court. Muroll Gesellschaft M.B.H. vs. Tennessee Tape, Inc., 908 S.W.2d 211, 213 (Tenn. App. 1995).

. . . . [discussion of *Muroll Gesellschaft*, 908 S.W.2d at 213, and *V.P. Buildings,* 2002 WL 15634, and factors to consider omitted]

With these factors in mind, the Court makes the following findings of fact. Sunstates owns one hundred percent of the National Development Corporation. Sunstates and NDC shared the same president, vice president, and chief financial officer. Sunstates and NDC share the same business office location and phone line. It is impossible to contact NDC as it is not listed in the phone book. If one does call the phone number listed on the NDC letterhead, the receptionist states one has reached Sunstates Corporation. Significant amounts of cash were transferred from NDC to Sunstates as a result of "professional fees" and no invoices were produced explaining these transfers.

On Saturday December 31, 1994, while this controversy was pending, NDC transferred the majority of its assets out of the corporation. According to its financial statement, all of the remaining land contract receivables totaling $5,116,720 were transferred to two other entities. $2.7 million went for the full repayment of a loan to an affiliate company. However, the remaining $2.4 million was transferred to Sunstates in exchange for a note payable which was unsecured.

Lee Mortenson was the president and chief operating officer of Sunstates. He had also been president of NDC since 1990. Mr. Mortenson had no knowledge of the chain of subsidiaries in the various holding companies. He along with Rick Leonard and Glen Kennedy were directors of NDC. Although Leonard was the chief financial officer of NDC, he had no explanation as to why the $2.4 million note from Sunstates to NDC was unsecured, and he had no knowledge of either the business in which NDC was engaged or its sources of income.

Clyde Engle is an individual residing in the state of Illinois. All of the numerous corporations set forth in the above chart are controlled either directly or indirectly by Engle. Engle was neither an officer or director of NDC. The genesis for the transfer of $2.4 million of land contracts from NDC sprang from Engle. As chief executive officer of Sunstates, Engle made a "proposal" to the chief executive officer of NDC that NDC ought to transfer these receivables to Sunstates. Engle's claim that his proposal was an attractive transaction from NDC's point of view begs

the question. What Mr. Engle never explained was why he would be concerned with making a proposal regarding a company in which he was neither an officer nor a director and why this proposal was apparently accepted by the directors and officers of NDC without question; and why NDC failed to request security for this $2.4 million note.

Mr. Engle declined to appear in court at either the first or second trial of this bifurcated case. Where the evidence tends to fix liability on a party, who has it in his power to offer evidence to rebut the unfavorable inferences which the proof tends to establish, and that party refuses to offer such proof, it may be inferred from the facts shown that the fully developed evidence would establish liability on his part. This rule applies only when the plaintiffs' proof and the legal deduction therefrom make out a prima facie case against the defendant. Runnels v. Rogers, 596 S.W.2d 87, 90 (Tenn. 1980). This Court believes that this is such a case. As is evident from Judge Harris' previous order, Engle refused to answer questions regarding his finances and the corporate structure of the scores of companies which he controlled. Mr. Engle has never explained to the Court's satisfaction how and why he was able to cause NDC to accept an unsecured note for $2.4 million of receivables.

In 1994 Mr. Engle received $2,975,090 from Sunstates or its affiliates; in 1995 he received $524,236; in 1996 he received $293,826; and in 1997 Sunstates paid Mr. Engle $71,916. The business operations of Sunstates has for all practical purposes come to a halt. The note which NDC holds from Sunstates is worthless since there are no assets to pay the note. Neither Indiana Financial, Wisconsin Reit, Hickory Furniture, Telco Capital, or RDIS have the ability to pay the note owed by Sunstates to NDC since the corporations from RDIS down the chain of companies are insolvent. Most of the funds transferred to Engle were funneled through the Bank of Lincolnwood, located in Chicago, Illinois. Engle has an indirect interest in the Bank of Lincolnwood through a holding company for which he refused to provide the name nor indicate whether he was a director. Many of the transfers of funds to Engle from Sunstates Corporation are documented by Bank of Lincolnwood memoranda indicating "per the request of Clyde Engle". There was no evidence of any transfers of funds from Engle back to any corporation. All of the transfers were to Engle. While the defendants attempted to argue that it was possible that the transfers could have come from other entities, defendants put on no proof to support that position and the best person to respond to those allegations, Mr. Engle, elected not to attend the trial.

Sunstates purchased approximately $1.9 million dollars of oriental art, antique jewelry, rare books and other collectibles which were maintained in Clyde Engle's home in Illinois. Likewise Sunstates purchased a Rolls Royce from Libco, a corporation in which Engle was the majority shareholder. This automobile also

-23-

appears to be in the possession or control of Mr. Engle. Again, Mr. Engle elected not to offer any reasonable explanation to this proof.

It is evident to this Court that Mr. Engle exercised complete dominion over Sunstates, National Development Corporation, and all of the other scores of companies set forth in the chart above. There was evidence of Mr. Engle's dominion not only over the transfers of funds which were funneled to him up the corporate chain through the Bank of Lincolnwood, but also over the particular business decision in this case i.e. the transfer of N.D.C.'s assets to Sunstates Corporation. All of the corporations under Engle's control are now insolvent, and it would be an injustice to allow Mr. Engle to use the corporate entity as a shield to thwart the satisfaction of the judgment obtained in this case. The evidence supports the conclusion that NDC, Sunstates and the other companies were mere instrumentalities for Mr. Engle and therefore the corporate entity will be disregarded in order to accomplish justice in this case. V.P. Buildings, Inc. v. Polygon Group, Inc., supra.

Therefore, the Court finds plaintiffs prior judgment against National Development Corporation, Inc. shall likewise be a judgment against Sunstates Corporation and Clyde Engle, individually.

Since this issue was tried by the court sitting without a jury, we review it *de novo* upon the record and presume the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). The decision of the trial court turns, in part, on the trial court's perception of the witnesses' candor and truthfulness. Therefore, we give great weight to the credibility accorded each witness by the trial judge. *Weaver v. Nelms*, 750 S.W.2d 158, 160 (Tenn. Ct. App. 1987). Our review of the record not only leads us to the conclusion that the evidence does not preponderate against the specific findings of the trial court, the record fully supports those findings. Accordingly, we see no benefit to further analyze the evidence or the trial court's findings. Thus, the issue is whether the facts as found by the trial court are sufficient to sustain, as a matter of law, the trial court's conclusion that Clyde Engle was the alter ego of National. This analysis takes us back to the *Oceanics v. Barbour* matter we discussed earlier. The *Oceanics* trial court made several findings of fact relative to the *Allen* factors. The trial court found "that, (1) at all relevant times, OSC's corporate office was Barbour's private residence; (2) the Antarna was OSC's principal asset; (3) its sale effectively liquidated the corporation; and (4) the 'transfer of the proceeds from the sale of Antarna to Barbour's personal account rendered OSC without assets.'" *Oceanics*, 112 S.W.3d at 145. The trial court further found "that '[a]t all material times, OSC was undercapitalized.' While a mere $2,000 was paid into the corporation as capital, the alleged debt OSC owed to Barbour was in excess of $800,000. Essentially all of OSC's funds came through 'loans' from Barbour. (footnote omitted) In addition, the court noted that OSC 'failed to completely observe corporate formalities.'" *Id.* at 145. On appeal, this court opined as follows:

[A]fter reviewing all of the evidence – in the context of the *Allen* factors – we cannot say that the evidence preponderates against the trial court's dual determinations (1)

that Barbour is the alter ego of OSC and, as a consequence of this finding, (2) that the plaintiff is entitled to pierce the corporate veil of OSC and cast Barbour in judgment based upon the OSC judgment. Since the piercing of the corporate veil is a "matter particularly within the province of the trial court," *Electric Power Bd.*, 691 S.W.2d at 526, we conclude that there is no basis for disagreeing with the trial court's explicit finding that the piercing of the corporate veil was "necessary to accomplish justice." *Schlater*, 833 S.W.2d at 925. Giving due consideration to the trial court's credibility determinations, [footnote omitted] we conclude that this evidentiary issue must be resolved against Barbour.

*Id*. at 142-43. This court further concluded that the plaintiff had successfully established that Clifford Barbour and OSC were one and the same, stating that Clifford Barbour was simply OSC's "other self." *Id*. at 145 (*quoting Matthews*, 796 S.W.2d at 694.)

Applying the trial court's findings of fact to the factors to be considered, we find no error with the trial court's conclusion that National Development Company, Inc. is the alter ego of Clyde Engle, and that such a finding justifies piercing the corporate veil and holding Engle liable for the judgment rendered against National.

## PERSONAL JURISDICTION OVER CLYDE ENGLE

Clyde Engle contends that the judgment against him is void because the trial court did not have personal jurisdiction over him. This contention is based on the fact that Engle is a resident of the state of Illinois and his contention that he never conducted business in Tennessee and, thus, did not subject himself to the jurisdiction of the courts of Tennessee.

The issue for this court to determine is whether the trial court's exercise of personal jurisdiction over Clyde Engle meets due process requirements. *Manufacturers Consolidated Services, Inc. v. Rodell,* 42 S.W.3d 846 (Tenn. Ct. App. 2000). The jurisdictional reach of the courts of Tennessee is determined by the long-arm statute of Tennessee. *Four Seasons Gardening & Landscaping, Inc. v. Crouch*, 688 S.W.2d 439 (Tenn. Ct. App. 1984); *see also Warren v. Dynamics Health Equipment Mfg. Co., Inc.*, 483 F.Supp. 788, 790 (D.C. Tenn. 1980) (citing *King v. Hailey Chevrolet Co.*, 462 F.2d 63 (6th Cir. 1972)). Tennessee's long-arm statute, Tenn. Code Ann. § 20-2-214, has been interpreted to extend to the limits of personal jurisdiction imposed by the Due Process Clause of the United States Constitution. *Bridgeport Music, Inc. v. Agarita Music, Inc.*, 182 F. Supp. 2d 653 (M.D. Tenn. 2002). The pertinent subsections of Tennessee's long-arm statute provide:

(a) Persons who are nonresidents of Tennessee and residents of Tennessee who are outside the state and cannot be personally served with process within the state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:
      (1) The transaction of any business within the state;
      (2) Any tortious act or omission within this state;

. . . .

> (6) Any basis not inconsistent with the constitution of this state or of the
> United States;

Long-arm jurisdiction can be invoked over a non-resident individual because of that individual's role with respect to a corporation that is within the range of the long-arm statute and who uses that corporation as his agent. *Warren*, 483 F.Supp. at 790. The theory of invoking jurisdiction over individuals who use corporations as their agents is as follows:

> If the person's control over the corporation is such that the corporation is really acting as his agent in doing the acts giving rise to the suit, then he can be reached through the long-arm statute even though he personally had no contact with the forum state. The courts speak in terms of "piercing the corporate veil" or the "alter ego" doctrine in discussing the susceptibility of individuals to long-arm jurisdiction. Not all cases treat the question in terms of those doctrines drawn from corporation law, however. (footnotes omitted.)

*Wilcox v. Precision Parachute Co., 685 F.Supp. 821, 823 (D.Kan. 1988) (*quoting Robert Casad, JURISDICTION IN CIVIL ACTIONS, ¶ 4.03[4] (1983)).

The fiduciary-shield doctrine precludes jurisdiction over an individual acting exclusively as a corporate officer on behalf of a bona fide corporation. *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985). However, the obverse of that rule can be applied to warrant a finding of personal jurisdiction over the person by attributing the corporate contacts with the forum to the individual. *Stuart*, 772 F.2d at 1197. Thus, if the corporation is not a viable one and the individual is conducting personal activities and using the corporate form as a shield, a court may pierce the corporate veil and assert personal jurisdiction over the individual based on the corporation's activities within that state. *See* 4A Charles A. Wright and Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1069.4, p. 186 (3ʳᵈ ed. 2002).

It should also be understood that a suit against an alter ego, in which the plaintiff seeks to pierce the corporate veil in connection with a previously-obtained judgment against a corporation, is not "a separate and independent cause of action." *Oceanics,* 112 S.W.3d at 145 (quoting *Matthews Const. Co. Inc. v. Rosen*, 796 S.W.2d 692, 693, n. 1 (Tex. 1990)).[3] When a plaintiff obtains a judgment against the corporate entity, it also obtains a judgment as to any of its alter egos. *Oceanics*, 112 S.W.3d at 145 (citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 608 F.Supp. 1261, 1264 (S.D.N.Y.1985)). Once a trial court has determined that an individual is a corporate entity's other self and a judgment against the corporate entity is in place, then there is also in place a judgment against the individual who is the corporate entity's other self. This is because

---

[3]Thus, Texas, the state of incorporation of National, recognizes that an action to pierce the corporate veil in connection with an action to obtain a personal judgment against the alleged alter ego corporation is not "a separate and independent cause of action." *Matthews Const. Co. Inc. v. Rosen*, 796 S.W.2d 692, at 693, n. 1 (Tex. 1990).

-26-

the individual is no longer a legally separate entity from the corporate debtor.[4] *Oceanics*, 112 S.W.3d at 146 (citing *Matthews*, 796 S.W.2d at 694); *see also Passalacqua*, 608 F.Supp. at 1264 (holding that the corporation and those who have controlled the corporation are treated as one entity).

It is undisputed that National conducted business in Hickman County, Tennessee with the plaintiffs, which gives the courts of Tennessee jurisdiction over National, and we have concluded that Engle is the alter ego of National. Therefore, the activities National conducted in Tennessee are attributable to its "other self" – Clyde Engle. Accordingly, Clyde Engle not only conducted business in Tennessee, he conducted business in Hickman County, Tennessee with the plaintiffs and is, therefore, subject to the jurisdiction of the Circuit Court of Hickman County, Tennessee. We, therefore, affirm the determination by the trial court that it had personal jurisdiction over Clyde Engle.

## IN CONCLUSION

The judgment of the trial court is affirmed in all respects, and this matter is remanded to the trial court with costs of appeal being assessed against the appellants, National Development Company, Inc., Sunstates Corporation and Clyde W. Engle, jointly and severally, for which execution may issue.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[4] Provided the alter ego is a party to the action.



Corporate Chart
as of 9/30/96

Source: Coronet
1996 Third Quarter
Statement