IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 1, 2011

## MELVIN B. SMITH, ET AL. v. GARY HANKINS, ET AL.

### Appeal from the Chancery Court for Bledsoe County
No. 2908    Jeffrey F. Stewart, Chancellor

_____

### No. E2010-00733-COA-R3-CV-FILED-AUGUST 30, 2011

_____

This appeal involves a boundary line dispute raised by the plaintiff, Melvin B. Smith and his wife, Charlotte E. Smith ("the Smiths") and a request for an easement by the defendants, Gary Hankins and Stanley Hankins ("the Hankinses"). After a trial, the court entered rulings in favor of the Hankinses as to both the establishment of the boundary line and the easement. The Smiths appeal. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Keith H. Grant, Chattanooga, Tennessee, for the appellants, Melvin B. Smith, Jr. and Charlotte E. Smith.

Howard L. Upchurch, Pikeville, Tennessee, for the appellees, Gary Hankins and Stanley Hankins.

### OPINION

### I. BACKGROUND

The dispute between the parties concerns the location of a disputed boundary line and whether an easement exists across the property of the Smiths. The real property is located on the Cumberland Mountain in Bledsoe County near the Tom Hale Flats Road. The Smiths purchased their 50-acre tract from Pauline Reiber in August 2002, approximately four and a half years after the Hankinses purchased a neighboring 50-acre tract from Neva B.

Swafford in March 1998.

Both properties were formerly owned by Elisha Webb. Mr. Webb had purchased the Smiths' tract in April 1927. The property description in Mr. Webb's 1927 deed was the same as the one noted in the Smiths' deed. Mr. Webb purchased what is now the Hankinses' property roughly two months later in June 1927. The deed describing the Hankinses' property has likewise remained unchanged since 1927. The properties remained joined in Mr. Webb's name until 1952, when he sold the tract now belonging to the Smiths to Robert Pendergrass and Arthur Pendergrass ("the Pendergrasses").

The Smiths' tract "fronts" the Hankinses' tract, and is between the nearest access road, Tom Hale Flats Road, and the Hankinses' property. Thus, to access the Hankinses' tract from Tom Hale Flats Road, one must cross the Smiths' property. The record reveals that a visible roadway across the Smiths' property from Tom Hale Flats Road to the Hankinses' property has been in existence for over 60 years. The Smiths, however, since they obtained the property have denied the Hankinses use of the roadway.

The Smiths dispute the location of the boundary between the two properties. Their deed describes the disputed boundary line as "South 70 degrees east 57 poles." As noted above, all deeds' in the Smiths' chain of title contain the same boundary description; no owner in the chain of title was ever granted more than 57 poles. The Smiths suggest that their property actually extends an extra 21 poles, based on another grant from the 1800s known as the Rankin grant,[1] which adjoins the properties.

In 2002, the Hankinses hired surveyor Gene Reid to survey their property. In 2004, after the Hankinses allegedly encroached onto the Smiths' property, a complaint was filed by the Smiths for injunctive relief. Two years later, the Smiths hired Arnold Boynton, another registered surveyor, to survey the disputed area. In 2008, the Smiths hired Mr. Reid, who had performed the 2002 survey for the Hankinses, to survey the property. Mr. Reid's efforts produced a different result from his work in 2002, due to his review of deeds that were in neither parties' chain of title and also the use of calls not mentioned in either parties' deeds – namely a planted stone.

One deed relied upon by Mr. Reid that is not in the chain of title is the Myers and Noone deed.[2] Regarding it, Mr. Reid testified as follows:

---

[1]The original land grant.

[2]During Mr. Boynton's testimony, he related the following:

(continued...)

Q . . . [T]ell me why the Myers and Noone deed is, therefore, significant in your surveying, in your second survey of the property, your 2008 survey.

A Because it runs with the original – it's describing the same lines as the original Samuel Rankin grant.

Q Okay.  What is different about those two?  Why don't you just use the land grant, then?

A Well, because the land grant didn't give the distance from the center of the creek.

Q Okay.  And why is the distance from the center of the creek important?

A Because that's the only established corner that everybody agreed to is the stone that's in the center of the creek, so we needed a measurement from that in order to find that stone we found.

Q Okay.

A And the only place that measurement was given is in the Myers and Noone deed.

* * *

A If I . . . [d]idn't look at the chain of title and go back to when Tom Hale got it from Samuel Rankin and if I didn't look at the original land grant and I didn't find the stone that was there [in the southeastern corner] then I would have used . . . the same opinion that I did in 2002.

* * *

Q Okay.  Using the Myers and Noone deed and that stone, does the rest of the survey match up with the eastern boundary, the rest of the eastern boundary of

---

[2](...continued)
Q Do you know what the significance of that Myers and Noone deed is?
A It was a mineral tract is the best I can tell.  The Myers and Noone owned a lot of this and they actually took over the Sequatchie . . . Valley Coal and Coke Company property and they were the ones that distributed it.

the Smith property match up with the eastern boundary of the land grant?

A Yes.

Mr. Boynton, the surveyor utilized by the Hankinses, testified as follows:

Q . . . As a surveyor, Mr. Boynton, I realize that everything is significant, but did you elect to accept, in other words, to agree with or adopt that rock and that call regarding the rock as the corner of the Hankins property?

A No, I didn't.

Q . . . [E]xplain to His Honor why you decided that that rock was not material or not the corner here of the Hankins property.

A Because that stone that it refers to, I'd have to look back at the numbers, but I believe it called for it being 121 poles in all from a stone that's back in the Hankins property that is not there anymore. The only reference to that with the measurement is a passing call, passing this stone in the center of the creek to the Old Mill Dam. The Smith deed had a direct measurement of 57 poles from that and this other one was passing it at 64 poles which left 68 poles. I chose to use the direct measurement over the passing call and that's pretty standard with most boundary recommendations and most of all textbooks that I know referring to that.

* * *

A . . . [D]irect measurement takes precedence over a passing call.

Later in his testimony, Mr. Boynton noted as follows:

Q Does that create some doubt in your mind that – or some thought in your mind that the eastern boundary of the Smith property should also follow the eastern boundary of the land grant and the Myers and Noone deed?

A Not terribly. Not – no, because Mr. Webb owned both of those properties at one time and has tried to divide them into two 50-acre tracts.

-4-

On redirect, Mr. Boynton observed

A It's very important to me that that chain of title has carried on for . . . [over] 130 years[.]

Q Yes, sir.

A It's over a hundred years and it's been, apparently measured to be that distance once. Someone should – if there was an error in it, someone should have caught that in that length of time.


At the conclusion of the proceedings, the trial court ruled as follows from the bench:

THE COURT: All right. I've had a chance now to examine the exhibits. . . .

The deeds, I looked at. Obviously, there was a consistency stipulated as to all of the language in the deeds, so we really didn't have any disputes. The photographs were helpful to sort of be able to see a little bit of what the land looked like out there, but essentially we are here to establish a boundary line, a boundary line that is greatly in dispute.

It always amazes me how surveyors are a lot like doctors in some respects. They all come up with a different opinion about things. And I think these surveyors are excellent people. They are people of good quality. I don't think either of them would misrepresent anything to the Court and so I think they are both credible.

I think at the heart of this case has to do with where is the starting point, where do you begin, as far as cases are concerned. And I think what I'm trying to say about surveying is this. It really boils down to where do you start and how do you start and what are the assumptions you make in the starting point. . . .

This case, really, for me, boils down to a fairly simple issue and, as I said, that's the starting point. There are questions about the location of the beginning point of the property of Mr. and Mrs. Smith that Mr. Hankins, the two brothers, have said it's one place. They have said that it's another. I looked at it pretty carefully and listened very carefully during the course of the day and here is what it seems to me is the solution to establishing where that boundary line is located.

-5-

I think there was very clearly a unity of title between . . . the property lines that would have been in the Rankin/Hale grant and any other properties that laid to the east when Elisha Webb received title to not only the Rankin/Hale properties, but also the properties to the east. And that created, as I said, a unity of title and then any questions about that location of any boundary line in that respect would have evaporated. Then he, after he unified the title, conveyed out property and he conveyed property that's in the chain of title of Mr. Smith, Mr. and Mrs. Smith, and he made the conveyance or, rather, his survivors, his beneficiaries made a conveyance out of his estate to the chain of title of Mr. Hankins and his brother, both of the Hankinses.

So having said that, I think, then, it was Elisha Webb who established where the boundary line would be. And that line was established in the deed that he first made to Mr. Pendergrass. And as I read the deed that he made to Mr. Pendergrass, because that conveyance was made in the Smith chain of title before the conveyance that was ultimately made in the conveyance or chain of title to the two Mr. Hankinses, and that deed basically is the one – and I'm going to refer to that south line, because I think that's what you all said, that it is the south line that will establish this case, and I think that south line was clearly described as being south 70 degrees east 57 poles and I think to the point, whether it was a hickory tree or a fallen hickory, that is the point.

Now, it was argued and I think there was some proof that there are mistakes in deeds and that this would have made more sense had it been 57 – instead of 57 poles, it should have been 75 poles, but, again, I don't think that made any difference once the properties were unified in the title of Elisha Webb. And, besides, that 57-pole figure had been in there for about 130 years, maybe more. And I think that if that mistake was a serious error, that is, something that shouldn't have been, then that would have been corrected somewhere in the course of 130 years.

Also, I think it would have created a serious error in what apparently was the intent of Mr. Elisha Webb and his survivors or beneficiaries of his estate in their attempt to convey 50 acres to each party, and that's what his deeds call for more or less. While that doesn't work out maybe exactly right using the line that I've said, it brings it much closer than what we currently would have if we didn't hold to that line. So I find, then, that that would be the line which is the basis of the line dividing these two properties.

Now, as to which survey to use, I think I heard the testimony from Mr. Reid

-6-

that Exhibit Number 3 – I'm trying to find it up here, but he said on Exhibit Number 3, that would be the correct survey, and he did one in 2001. I think he used the exact calls referring to south 70 degrees east 57 poles and did the math and then he turned it and went north 20 degrees, it seemed like, a certain distance. So I'm going to use the line that he established in Exhibit Number 3 as the line that's in play.

In this case, I think we heard, also, then, from the other surveyor that was Mr. Boynton. And Mr. Boynton, I think, said that, in his use, he turned and used as close an approximation as he could and I think that his was a little bit different. I don't think he got exactly the same numbers, but they are fairly close, but for the purposes of today's ruling, I'm going to apply, then, the survey that was introduced as Exhibit Number 3 in this case.

Now, having said that, there is the remaining issue about what to do about an easement. And there is no question that the conveyance of the tract that's in the Smith chain of title, that is, to Mr. Melvin Smith, did completely landlock the property that Elisha Webb had remaining and I think the law would be on his side, were he here today, asking for an easement by implication under the facts of this case and that is because there has been established clearly there was a unity of title in the name of Elisha Webb.

There is no question that there is no other practical way to get there, as I understand the proof. While Mr. Gary Hankins may own some adjoining property, the testimony was that it's not accessible from his property by vehicle and also that he is just one of the two co-tenants. Stanley Hankins being the other co-tenant, there was no proof that he had any adjoining property as well. So those would be other reasons that I would find that there is an easement by implication and that there would be, therefore, then, a necessity for the easement in order to beneficially use and enjoy the land. One of the beneficial uses would be the ability to get access to the timber.

Now, I'm not going to locate it at this point in time. I'm not sure that it is by default necessarily the location of an old roadbed that I heard talked about that was traversed by foot, by tractor, by four-wheeler, and maybe by truck, but certainly it has not been used since 1985. That was almost 19 years before this lawsuit was filed and it clearly shows that there are trees that are grown up in that path. I would ask the attorneys to brief that issue about where it has to be located. If it's on an existing easement, if that has to be it, then I may have to make a separate finding of facts about whether that was clearly the intent.

I believe there was some testimony that Mr. Webb used a Jeep and went back there, but I think the testimony was it was three or four times that anybody could remember him doing it, so I'm not sure that that would necessarily establish it in the old roadbed. It may be that the law is that it's shown to be the most expedient without damaging or in some way harming the other property owners' use of their land as well, so I'll let you brief me on that. I'll take a look at it and I'll let you know about where the easement would be located.

In its written order, the trial court provided as follows:

[I]t duly appears to the court, for the reasons set forth in the court's oral pronouncement . . . that the common boundary between the properties of the parties should be established pursuant to the division lines set forth on the initial survey prepared by Gene Reid during the period Mr. Reid was employed by the Defendants, said line being similar and near the line established by Arnold Boynton, all as described fully on an unsigned plat prepared by Gene Reid on April 26, 2002 and introduced as Exhibit 3 during the trial of this action; that pursuant to the legal doctrine of easement by implication or necessity, the Defendants are entitled to access their real property over and across the real property of the Plaintiffs, and an easement for ingress and egress should be established hereby in favor of the Defendants; that the court hereby reserves jurisdiction over this matter to locate this easement . . . .[3]

## II. ISSUES

The Smiths raise four issues on appeal, which are as follows:

1. Whether the trial court erred in determining the location of the respective boundary lines of the parties' real properties.

2. Whether the trial court erred in determining that an easement exists across the Smiths' property.

3. Whether the trial court erred in finding that the previous owner of both tracts of land involved intended to convey the properties in equal shares.

---

[3]Page 3 of the trial court's order is missing from the record.

4. Whether the trial court erred in failing to rely on Tenn. Code Ann. § 28-2-109 in determining the respective boundary lines of the parties.

### III. STANDARD OF REVIEW

This court conducts a de novo review of the trial court's decision in a boundary dispute with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates against those findings. *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). "In resolving a boundary line dispute, it is the role of the trier of fact to evaluate all the evidence and assess the credibility of the witnesses." *Mix v. Miller*, 27 S.W.3d 508, 514 (Tenn. Ct. App. 1999) (citing *Norman v. Hoyt*, 667 S.W.2d 88, 91 (Tenn. Ct. App. 1983)). The judgment of the trial court should be affirmed, absent errors of law, unless the preponderance of the evidence is against those findings. *Phillips v. Woods*, No. E2007-00697-COA-R3-CV, 2008 Tenn. App. LEXIS 193, *15 (Tenn. Ct. App. Mar. 31, 2008). Due to the fact-intensive nature of boundary line disputes, the trial court is best suited to assess the credibility of witnesses and its credibility determinations are binding on this court unless the evidence preponderates against them. *Id.*, at *34. When the trial court makes a determination accepting one surveyor's findings over that of another, that same deference requires this court to accept the trial court's findings. *Id.*

### IV. DISCUSSION

#### A.

The Smiths argue that the evidence preponderates against the trial court's finding of the location of the eastern boundary of their property. They contend the trial court erred by not adopting the latter findings of Mr. Reid, revised from an earlier occasion he surveyed the property.

The Smiths' deed contains the following language:

Lying and being on Cumberland Mountain, and BEGINNING at a large rock in the bed of Flat Branch in the line of a 300 acre tract, same being Grant #9576; thence S. 70 E. 57 poles to a hickory and pointers; thence N. 20 E. to a post oak sapling and pointers; thence S. 70 E. 43 ½ poles to a blackoak and

pointers; thence N. 20 E. 63 poles to a stake in a road known as Rankin Cove Road leading to the Mooneyham place; thence with said road Northwestwardly to the Flat Branch; thence with said branch as it meanders Southwestwardly to the BEGINNING, containing 50 acres, more or less.

The main dispute between the parties is whether the call for a distance of 57 poles is correct, or whether, as the Smiths claim, that call is wrong and should actually measure 76 poles.[4]

To resolve the dispute of whether the boundary line was correctly established by a measurement of 57 poles, the trial court relied on the extensive recorded history of the property.

In 1841, Samuel Rankin received a 300-acre tract of land by way of a land grant. In 1874, Rankin sold the tract now in dispute (Smiths' property) to Thomas Hale, Jr. That tract was 50 acres in size and contained the same language as Smiths' current deed. In April 1927, Elisha Webb purchased the land that is now the Smiths' property. The deed to Mr. Webb contained the same description, with the disputed boundary line described as measuring "South 70 degrees, East 57 poles to a fallen hickory." Two months later, in June 1927, Mr. Webb purchased the property adjacent to the property now owned by the Smiths (the Hankinses' property).

Mr. Webb owned both of the properties for nearly 25 years. In 1952, he sold the property now belonging to the Smiths to the Pendergrasses. In that 1952 deed, the description of the boundary was the same as that given to Mr. Hale in 1874, the same as was given to Mr. Webb in 1927, and the same as the Smiths' current deed contains—that is, "South 70 degrees, East 57 poles to a fallen hickory."

Smiths contend however that the call of 57 poles is incorrect based on a deed that was introduced at trial referred to as the Myers and Noone deed. The Myers and Noone deed was not in either parties' chain of title, but the Smiths argue that it contains the correct description of the property that Mr. Rankin was given in 1841. This deed was used by Mr. Reid in his second survey to establish what the Smiths argue is the correct eastern boundary line to their property because it contained in its description a specific distance for the southern boundary. Mr. Reid stated that he then measured from the starting point in the Smiths deed – a stone in Flat Branch – to the western boundary and subtracted that distance from the total distance listed in the Myers and Noone deed, leaving a distance from the stone to the eastern boundary that was not 57 poles as the deed itself stated but rather 76 poles.

_____

[4]Mr. Boynton testified that one pole equals 16.5 feet.

-10-

The Smiths assert that Mr. Reid found nothing in the public record that would indicate Mr. Rankin ever transferred, or intended to transfer, any additional property along the eastern portion of his property, below Rankin Cove Road, other than what he transferred to Mr. Hale back in 1874. Thus, the Smiths argue these findings support that the eastern boundary of the Rankin grant would also be the eastern boundary of their property.

There is precedent to support the Smiths' reliance on a deed other than theirs. *See Griffin v. Underwood,* No. 02A01-9606-CH-00134, 1997 Tenn. App. LEXIS 223, at *11 (Tenn. Ct. App. Mar. 31, 1997). However, this approach is more commonly utilized in determining boundary lines when a deed is a "boundary deed," as the Hankinses' is, which is a deed that includes a description based on the boundaries of the surrounding properties. The Smiths' deed contains distances, metes and bounds, and courses, thereby decreasing the necessity of relying on a deed outside the chain of title of either party.

The Smiths also argue that there is other evidence to support adopting their proposed boundary line. They rely mainly on a planted stone that would match up to what the Myers and Noone deed identifies as the southeast corner of the property, but there is no evidence of a stone being used as a marker in any call of any deed in the property's long recorded history.

Two separate surveyors, Mr. Reid and Mr. Boynton, surveyed the property and each had remarkably similar findings while using the calls in the Smiths' deed, and each was able to do so without reliance on this stone that appears nowhere in the property's chain of title. Based on the extensive, documented history of the Smiths' property, with numerous past deeds conveying the exact same description of the property and yielding in deference to the trial court's credibility assessment of the witnesses, we find that the evidence does not preponderate against the judgment of the trial court on this issue.

B.

The Smiths also assert error by the trial court in its finding that the Hankinses are entitled to an easement. They argue that the alleged roadway across their property was used only sparingly for hauling logs or occasional uses with a tractor or ATV.

"An easement is a right an owner has to some lawful use of the real property of another." *Pevear v. Hunt*, 924 S.W.2d 114, 115 (Tenn. Ct. App. 1996). To establish an implied easement, the party asserting its right to an easement must prove three elements:

1) a separation of title;

2) a necessity that, before the separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was meant to be permanent; and

3) a necessity that the easement be essential to the beneficial enjoyment of the land granted or retained.

*Haun v. Haun,* No. E2004-01895-COA-R3-CV, 2005 Tenn. App. LEXIS 252, at *9 (Tenn. Ct. App. Apr. 28, 2005). Evidence establishing those three elements of an implied easement must meet the ordinary preponderance of evidence standard. *Id.,* at *10.

The first element was established by Mr. Webb's 1952 sale to the Pendergrasses. The Smiths stipulated that the first element was not in dispute.

In considering whether the second element was met, the intent of the parties at the time of separation of title must be considered. *Id.* The roadway in question has been used since mules and wagons were the primary means of transportation. Testimony was introduced by Smiths' witness, Marvin Smith, that he saw tractors and ATVs using what he described as "an old wagon road." Testimony was also introduced from Junior Hankins that he had used the roadway for approximately 20 years. Mr. Hankins further testified that Mr. Webb, the property's previous owner, had used the roadway to access the tract now belonging to the Hankinses. The testimony from these witnesses supports a finding that the second element of an implied easement was met, since the testimony suggests that the roadway had been used for accessing the property for a long time before Mr. Webb sold the property and the use of the roadway continued after Mr. Webb sold the property.

The third and final element for an implied easement requires a necessity that the easement be essential to the beneficial enjoyment of the property.

The prevailing rule with respect to an implied easement provides that:

Where, during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another part, which servitude is in use at the time of severance and is necessary for the reasonable enjoyment of the other part, on a severance of the ownership the grant of the right to continue such use arises by implication of law.

*Haun*, 2005 Tenn. App. LEXIS 252, at *14 (quoting *Lively v. Noe,* 460 S.W.2d 852, 854-55 (Tenn. Ct. App. 1970)).

Junior Hankins stated that the roadway across the Smiths' property is the main access route to the Hankinses. He testified that formerly another roadway provided access to the property, but that roadway is now blocked off and unavailable for use to access the property. Mr. Hankins also related that the location of the Hankinses' property is near a steep bluff which makes accessing the property difficult, thereby increasing reliance on the contested roadway.

"As regards the required demonstration of necessity, Tennessee law interprets the concept of "necessity" as being "reasonably necessary" for the enjoyment of the dominant tenement, as opposed to strict or absolute necessity." *Haun*, 2005 Tenn. App. LEXIS 252, at *15 (citing *Rightsell v. Hale,* 18 S.W. 245, 246 (Tenn. 1891); *The Point, LLC v. Lake Mgmt. Ass'n, Inc.*, 50 S.W.2d 471, 478 (Tenn. Ct. App. 2000); *Johnson v. Headrick*, 237 S.W.2d 567, 570 (Tenn. Ct. App. 1948); *Allison v. Allison*, 193 S.W.2d 476, 477-78 (Tenn. Ct. App. 1945)).

After an exhaustive review of the record, we hold that the evidence does not preponderate against the trial court's finding that the three elements required to establish the existence of an implied easement across the Smiths' property have been established through the evidence and witness testimony. Accordingly, we find no reason to disturb the judgment of the trial court.

C.

The Smiths argue that the trial court erred in finding that the previous owner of both tracts of land intended to convey those tracts in equal shares. The Smiths assert that the trial court inferred an unspoken intention of Mr. Webb.

"The overriding purpose of any deed interpretation is the determination of the grantor's intent of the conveyance." *Hall v. Hall*, 604 S.W.2d 851, 853 (Tenn. 1980). In ascertaining the grantor's intent, we begin with the language of the deed itself and the circumstances surrounding its creation. *Hutchison v. Bd.*, 250 S.W.2d 82, 84 (Tenn. 1952). In construing the language in a written instrument, "the words expressing the party's intention should be given the usual, natural and ordinary meaning." *Ballard v. N. Am. Life & Casualty Co.*, 667 S.W.2d 79, 82 (Tenn. Ct. App. 1983).

The trial court was in a position to determine, based on the evidence presented at trial, whether Mr. Webb and his heirs intended to convey the tracts in equal shares. The record reveals that the deed from Elisha Webb to the Pendergrasses specifically provides "[c]ontaining 50 acres, more or less." It goes on to relate that "[t]his being the same property

conveyed to us by Thos. Hale, et ux., by deed dated April 23, 1927 . . . ." The deeds in the Hankinses' chain going back to Elisha Webb all state that the property conveyed amounts to 50 acres. Accordingly, the preponderance of the evidence supports the trial court's determination on this issue. We therefore find no error with the finding.

D.

Finally, the Smiths argue that the trial court erred in failing to apply Tenn. Code Ann. § 28-2-109 to determine the boundary lines of the parties. The statutory provision states:

> Any person holding any real estate or land of any kind, or any legal or equitable interest therein, who has paid, or who and those through whom such person claims have paid, the state and county taxes on the same for more then twenty (20) years continuously prior to the date when any question arises in any of the courts of this state concerning the same, and who has had or who and those through whom such person claims have had, such person's deed, conveyance, grant or other assurance of title recorded in the register's office of the county in which the land lies, for such period of more than twenty (20) years, shall be presumed prima facie to be the legal owner of such land.

The Smiths' predecessors in title, the Reibers, apparently began paying taxes on 74 acres rather than 50 acres back in the 1980s. The Hankinses and their predecessors in title have always paid taxes on 50 acres.

The preponderance of the evidence is that both sides of this dispute paid taxes on the disputed property. Therefore, the trial court correctly disregarded this statute in determining the boundary line of the parties. *Cupp v. Heath*, No. E2010-02364-COA-R3-CV, 2011 WL 3557059, at *10 (Tenn. Ct. App. Aug. 11, 2011); *Brooks v. Johnson,* No. E2007-02840-COA-R3-CV, 2008 Tenn. App. LEXIS 435, at *11 (Tenn. Ct. App. July 30, 2008).

Both parties had a rebuttable presumption of ownership based on Tenn. Code Ann. § 28-2-109. The trial court correctly decided the matter without reliance on the statute.

## V. CONCLUSION

The judgment of the trial court is affirmed and the case is remanded for collection of costs below. Costs on appeal are assessed to the appellants, Melvin B. Smith and Charlotte E. Smith.

_____
JOHN W. McCLARTY, JUDGE