RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MOHAN KUTTY, M.D.,

    *Plaintiff-Appellant,*

  *v.*

UNITED STATES DEPARTMENT OF LABOR,

    *Defendant-Appellee.*

No. 11-6120

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:05-cv-510—Thomas W. Phillips, District Judge.

Argued: January 29, 2013

Decided and Filed: August 20, 2014

Before: MOORE, WHITE, and LUCERO, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Russell Reid Abrutyn, AMERICAN IMMIGRATION LAWYERS ASSOCIATION, Troy, Michigan, for Amicus Curiae. W. Tyler Chastain, BERNSTEIN, STAIR & MCADAMS LLP, Knoxville, Tennessee, for Appellant. Geoffrey Forney, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee. **ON BRIEF:** W. Tyler Chastain, BERNSTEIN, STAIR & MCADAMS LLP, Knoxville, Tennessee, for Appellant. Geoffrey Forney, Paul L. Frieden, Mary E. McDonald, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee. Russell Reid Abrutyn, AMERICAN IMMIGRATION LAWYERS ASSOCIATION, Troy, Michigan, for Amicus Curiae.

_____

[*]The Honorable Carlos F. Lucero, Circuit Judge for the United States Court of Appeals for the Tenth Circuit, sitting by designation.

———————————

**OPINION**

———————————

HELENE N. WHITE, Circuit Judge.    Dr. Mohan Kutty appeals the district court's affirmance of the Department of Labor (DOL) Administrative Review Board's (ARB) determination that he is personally liable for back wages, including expenses physicians hired by his clinics incurred in obtaining their J-1 waivers and H-1B visas, and civil penalties.  Kutty ran medical clinics in Tennessee and Florida under several corporate entities.   Ten physicians employed by the clinics filed a complaint with the DOL claiming wage violations under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*.  The Administrator of the Wage and Hour Division determined that Kutty and the medical clinics violated numerous INA provisions.   An Administrative Law Judge (ALJ) affirmed, found the clinics liable for back wages and the costs of obtaining J-1 waivers and H-1B visas, held Kutty personally liable for the violations, and assessed a civil penalty.  The ARB affirmed the ALJ's decision, and the district court dismissed Kutty's petition for review and affirmed the ARB's decision.  Kutty appeals and we AFFIRM.

**I.**

**A.**

Kutty and his wife jointly own and serve as the only officers and directors of the Center for Internal Medicine, Inc., a Florida corporation.  From 1998 to 2000, Kutty opened five medical clinics in rural areas in Tennessee and hired eighteen physicians to staff the Tennessee clinics, seventeen of whom are the subject of this litigation.  Kutty used at least twelve wholly-owned corporate identities to employ the Tennessee physicians.  Kutty also made all major decisions about the operation of the Tennessee medical clinics:  he hired physicians, determined how many staff members would be employed, and determined staff and physician compensation.  Either Kutty or his wife signed all paychecks and Kutty handled all billing disputes and employee questions.

The seventeen physicians employed by Kutty originally entered the United States on J-1 nonimmigrant foreign-medical-graduate visas, 8 U.S.C. § 1182(j)(1). These visas allow physicians to remain in the United States for their graduate and medical training, but require them to return to their home country for an aggregate of two years following their J-1 visa's expiration upon completion of their studies. After this two-year period, physicians become eligible to apply for H-1B or L-1 visas, Lawful Permanent Resident status, or a change in nonimmigrant status. *See* 8 U.S.C. § 1182(e). The INA provides, however, that the two-year home-return requirement of the J-1 visas may be waived for physicians when an interested state or federal agency requests J-1 waivers on the physicians' behalf. A J-1 waiver on this basis requires the non-resident physician to submit a waiver application to the U.S. Department of State (with a filing fee) that demonstrates that the physician has a contract to practice medicine for at least three years in an area designated by the Secretary of Health and Human Services as having a shortage of health-care professionals. *See* 8 U.S.C. § 1184(l [letter el])(1); 8 C.F.R. § 212.7(c)(9)(i). Physicians with J-1 waivers are immediately eligible to apply for H-1B visas for nonimmigrants "coming temporarily to the United States to perform services . . . in a specialty occupation." 8 U.S.C. § 1101(a)(15)(H)(i)(b); *see* 8 U.S.C. § 1184(l)(l)(2)(A).

Each of the seventeen physicians Kutty employed obtained a J-1 waiver based on a contract of employment with Kutty to provide medical services in an underserved area. In order to employ H-1B nonimmigrants, employers must complete and file with the DOL a Labor Condition Application (LCA) that provides for wage-level guarantees, and have it certified by the DOL. 20 C.F.R. § 655.700(a)(3). The LCA certifies that the H-1B worker will be paid the greater of either the actual wage level the employer paid to other individuals with similar experience for the type of employment at issue or the prevailing wage level for the occupational classification in the area of employment. 8 U.S.C. § 1182(n)(1)(A)(i)(I)–(II). Kutty, acting as the medical director for the employing corporate entities, signed and filed the LCAs for the physicians, and the DOL certified the applications. The applicable wage rates specified on the LCAs ranged from $52,291 to $115,357.

Kutty attested in the LCAs that the information provided was "true and correct," that he would comply with DOL regulations, and that he would pay the wage rates required by law.

Kutty also signed and filed the physicians' H-1B nonimmigrant-worker petitions, in which he agreed to the terms of the LCAs "for the duration of the alien's authorized period of stay for H-1B employment." The Immigration and Naturalization Service (INS) approved the petitions and changed the visa status of the seventeen physicians from J-1 to H-1B.

Kutty also required the physicians to sign individual employment agreements that were almost identical to one another. Each contract was "contingent upon Employee obtaining a J-1 visa waiver of residency requirement and H-1B visa, Employee's certification by the State of Tennessee, and . . . subject to obtaining local hospital privileges and the necessary HMO, Medicare, and Medicaid approvals;" the physicians were required to devote forty hours per week to the practice of medicine for the Employer for an annual salary of $80,000; the terms of employment varied from three to five years, and could be terminated by Kutty without cause at any time by delivery of a signed and dated written notice of termination sixty days prior to the intended date of termination, or could be terminated immediately upon the occurrence of one or more of several events.[1]

In March 2000, Kutty hired Basvaraj Hooli (Hooli) as the administrator of his Tennessee operations. By late 2000, Hooli became aware that the Medical Clinics were encountering financial difficulties. Hooli visited and monitored the Tennessee clinics and reported to Kutty that the physicians were either absent or arriving late. Kutty and Hooli accused the physicians of lying about how many hours they were working and did not accept the physicians' explanations, for example, that they were visiting patients in the hospital when they were not in the clinic.

In January 2001, Kutty began withholding the physicians' salaries, which he released when they began seeing more patients. An attorney representing eight of the physicians sent

---

[1]The events included:

> 10:02. If Employee fails or refuses to comply with any policy, standard or regulation of Employer; or

> 10:07. If Employee fails or refuses to faithfully or diligently perform the provisions of this Agreement or the usual and customary duties of employment; or

> 10:12. If Employee exhibits undue absenteeism, fails to participate in continuing medical education programs to maintain current CME Certificate[.]

Employment Agreement, Appx. at 757–58.

Kutty a letter demanding "immediate payment of all amounts due, being the difference between the amounts previously paid and the rate of $115,000 per year as set forth in [the LCA.]" The letter warned Kutty that if he did not pay the requested amounts within one week, the physicians would contact the DOL. The letter also informed Kutty that he was prohibited from discriminating against the physicians for complaining about violations of the INA. After receiving the letter, Kutty stopped paying the eight physicians' salaries, except for one partial payment. Kutty continued to pay the physicians who did not join in the letter.

**B.**

On February 28, 2001, eight of the physicians filed a complaint with the DOL. On March 21, 2001, the Wage and Hour Division of the DOL's Employment Standards Administration conducted an on-site record inspection of the Sumeru Health Care Group, one of Kutty's medical facilities in Tennessee. That day, two additional physicians faxed Kutty a letter demanding back wages, and those physicians were added to the DOL complaint the following day. Kutty fired seven of the ten physicians included in the DOL complaint.

The Administrator of the Wage and Hour Division determined that Kutty and the Medical Clinics had violated numerous provisions of the INA by willfully failing to pay required wages to the physicians, failing to make LCAs available for public examination, failing to maintain payroll records, and retaliating against nine of the physicians for engaging in protected activity under the INA.[2]

Kutty appealed the Administrator's decision and the ALJ assigned to the case conducted hearings over fourteen days in June 2001. After the fourth day of the proceedings, Kutty was admitted to the hospital. The hearings continued in Kutty's absence at the suggestion of his attorney, and Kutty did not attend any additional hearing sessions. During the hearings, the ALJ admitted into evidence Kutty's deposition testimony from a prior related proceeding.

Hearings were scheduled to resume on November 26, 2001. On October 17, 2001, Kutty's counsel filed a motion to withdraw because Kutty had not paid his legal bills and there

---

[2]The Administrator determined that nine, not seven, physicians were terminated, as she deemed the failure to pay salaries to two physicians who resigned to be constructive discharges.

had been a breakdown in the attorney-client relationship. The ALJ granted the motion to withdraw on November 19, and the hearings resumed on December 4, 2001. At the beginning of the proceedings, the ALJ asked Kutty whether he wished to proceed without an attorney and Kutty stated that he wished to represent himself. Hooli, a non-attorney, was also present as the corporate representative.

The ALJ determined that Kutty and the medical clinics violated the INA by failing to pay required wages to the seventeen physicians, retaliating against nine of the physicians for engaging in protected activity under the INA, failing to make LCAs available for public examination, and failing to maintain payroll records.[3] The ALJ ordered Kutty and the medical clinics to pay back wages, including the costs of obtaining J-1 waivers and H-1B visas, totaling $1,044,294, and assessed $108,800 in civil penalties. In addressing the expenses for obtaining the J-1 waivers, the ALJ reasoned that the expense of obtaining the waivers is an unauthorized business deduction, reducing the wages below the required LCA rates. The ALJ also concluded that Kutty should be held personally liable for the violations because his violation of the INA was willful and because he acted as the alter ego of the corporations named on the LCAs. Finally, the ALJ barred Kutty from employing aliens for two years pursuant to 8 U.S.C. § 1182(n)(2)(C)(ii).

On May 31, 2005, the ARB affirmed the ALJ's decision. Kutty petitioned for review of the ARB's decision.[4] On August 19, 2011, the district court issued an order dismissing Kutty's petition and affirming the ARB's decision. Kutty timely appealed.

## II.

This court reviews de novo a district court's determination regarding final agency actions. *See Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); *Elaine's Cleaning Serv., Inc. v. United States Dep't. of Labor*, 106 F.3d 726, 728 (6th Cir. 1997). The ARB acts for the Secretary of Labor and is responsible for issuing "final agency decisions." *Sasse v. United States*

---

[3]No civil penalties were assessed for failure to maintain payroll records.

[4]Kutty petitioned for review to the United States Court of Appeals for the District of Columbia, which transferred the petition to the Eastern District of Tennessee.

*Dep't of Labor*, 409 F.3d 773, 778 (6th Cir. 2005) (citation omitted). This court will uphold the ARB's decision if it "is supported by substantial evidence," *Cole*, 661 F.3d at 937 (citation omitted), and if the decision is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Varnadore v. Sec'y of Labor*, 141 F.3d 625, 630 (6th Cir. 1998). To satisfy the substantial evidence standard, the ARB's decision must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *ITT Auto v. NLRB,* 188 F.3d 375, 384 (6th Cir. 1999). A decision is not arbitrary or capricious "when it is possible to offer a reasoned, evidence-based explanation for a particular outcome." *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 548 (6th Cir. 2002) (citations omitted).

This court gives "considerable weight and due deference to [the Secretary of Labor's] interpretation of the statute it administers unless its statutory construction is plainly unreasonable." *Id.* (citations omitted). An agency's interpretation of its own regulations "merit[s] even greater deference than its interpretation of the statute that it administers." *Id.* (citing *Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.*, 194 F.3d 125, 128 (D.C. Cir. 1999)). Thus, where the meaning of regulatory language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable. *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150 (1991).

**III.**

**A.**

Under the INA, employer-sponsors of H-1B nonimmigrants must pay a fee to file an H-1B petition on behalf of a nonimmigrant, and may not be reimbursed by their employees for "part or all of the cost" of that fee. *See* 8 U.S.C. § 1182(n)(2)(C)(vi)(II); 8 U.S.C. § 1184(c)(9). Implementing regulations clarify that employers may not deduct these costs—or other "business expenses"—from the nonimmigrant employees' wages, if such a deduction reduces the wage below the required level specified in the LCA. 20 C.F.R. § 655.731(c)(1). Under 20 C.F.R. § 655.731(c)(1), employers of nonimmigrants must pay the required wage to their employees "cash in hand, free and clear, when due, except that deductions made in accordance with

paragraph (c)(9) of this section may reduce the cash wage below the level of the required wage."
Paragraph (c)(9), in turn, notes that such a deduction may *not* be:

> a recoupment of the employer's business expenses (e.g., tools and equipment; transportation costs where such transportation is an incident of, and necessary to, the employment; living expenses when the employee is traveling on the employer's business; *attorney fees and other costs connected to the performance of H-1B program functions which are required to be performed by the employer (e.g., preparation and filing of LCA and H-1B petition)).* (For purposes of this section, initial transportation from, and end-of-employment travel, to the worker's home country shall not be considered a business expense.) 20 C.F.R. § 655.731(c)(9)(iii)(C) (emphasis added); *see also* 20 C.F.R. § 655.731(c)(7) (1995).[5]

When an employer's imposition of such business expenses on its nonimmigrant employees results in their receiving less than the required wage, "the Department will consider the amount to be an unauthorized deduction . . . even if the matter is not shown in . . . payroll records as a deduction." 20 C.F.R. § 655.731(c)(12); 20 C.F.R. § 655.731(c)(9) (1995).

Based on these regulations, the ARB affirmed the ALJ's conclusion that the physicians were entitled to reimbursement for fees, including attorney's fees expended in obtaining H-1B visas. The ARB noted that the regulations and related commentary specifically provide that attorneys' fees and costs associated with filing the H-1B petition are considered business expenses of the employer that may not be deducted.

Kutty argues that the costs of the H-1B visas are not business expenses because the "H-1B physicians were not required to obtain H-1B visas to work lawfully in the United States, since they were already in the U.S. and were eligible to have their nonimmigrant status changed from J-1 to H-1B." He asserts that, "The physicians would only have needed to obtain H-1B

---

[5]The current version of the regulation was implemented in early 2001, *see* 65 Fed. Reg. 801101-01, after most of the H-1B petitions were approved. The prior version of the regulation stated that employers may not deduct "business expenses" but, unlike the current regulation, did not provide as an example of such expenses the costs associated with filing H-1B visas. *See* 20 C.F.R. § 655.731(c)(7)(ii)–(iii) (1995). However, we agree that application of the current regulation raises no retroactivity concerns because it merely clarifies a pre-existing requirement and does not "attach[] new legal consequences to events completed before its enactment." *See National Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C. Cir. 2002) (citation omitted). In any event, Kutty does not argue on appeal that the newer regulation is inapplicable.

visas if they intended to travel outside of the United States . . . and as such, must not be considered a business expense."

This argument is unavailing. First, Kutty misstates the law, contending that the physicians "were not required to obtain H-1B visas to work lawfully in the United States." A nonimmigrant foreign medical graduate on a J-1 visa who seeks a waiver of the two-year home-return requirement on the ground that he will work in an underserved area for three years "may only fulfill the requisite 3-year employment contract as an H-1B nonimmigrant." 8 C.F.R. § 212.7(c)(9)(iii). Moreover, the business expense regulation plainly prohibits employers from passing on the costs of business expenses such as H-1B fees to their employees where those costs would reduce wages below the required rates. 20 C.F.R. § 655.731(c)(9)(iii)(C). Nothing in the regulations suggests that employers are exempted from this requirement if they hire nonimmigrants who are already in the United States on a separate visa. In promulgating the interim final rule that became the current version of the regulations, the DOL specifically clarified that the costs of filing LCAs and H-1B petitions "are the responsibility of the employer regardless of whether the INS filing is to bring an H-1B nonimmigrant into the United States, or to amend, change, or extend an H-1B nonimmigrant's status." Interim Final Rule Implementing Recent Legislation and Clarifying Existing Department Rules, 65 Fed. Reg. 80,110, 80,199 (Dec. 20, 2000). This court must give the DOL's interpretation of its own regulation "controlling weight unless plainly erroneous or inconsistent with the regulation," *Elaine's Cleaning Serv., Inc.*, 106 F.3d at 729 (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)) (internal quotation marks omitted), which it clearly is not. Accordingly, the ARB's determination that the costs—including attorneys' fees—of obtaining H-1B visas are business expenses within the meaning of 20 C.F.R. § 655.731(c)(9)(iii)(C) is neither arbitrary nor an abuse of discretion.[6] Nor is the regulation inconsistent with the statute. 8 U.S.C. § 1182(n)(2)(C)(i)(II).

---

[6]Amici assert that the regulation prohibiting deduction of "business expenses" is invalid because it exceeds the DOL's statutory authority. *See* Amicus Br. at 19–20 (*comparing* 20 C.F.R. § 655.731(c)(9)(ii) *with* 8 U.S.C. § 1182(n)(2)(C)(vi)). However, as both the Secretary and Amici point out, this issue was not raised by the parties below or on appeal. Accordingly, we decline to address whether the business expenses regulation goes beyond the DOL's statutory authority.

**B.**

The Administrator also treated the costs associated with obtaining J-1 waivers as business expenses of the clinics improperly passed on to the physicians.  Recognizing that the statute and regulations are silent on whether the employer must bear the expense of obtaining a J-1 waiver, and that while LCAs and H-1B applications are filed by the employer, the employee files for the J-1 waiver, the ALJ concluded:

> While it could be argued either way whether fees paid for obtaining J-1 waivers were the employers' or the employees' expenses, I cannot say that including J1 waiver costs in the category of employer business expenses is unreasonable, as the J1 waiver must be obtained before an H-1B visa can be issued.  I conclude that including J1 waiver fees and costs as employer expenses, as the Administrator has done in this case, is a reasonable interpretation of the law and the regulations, and within the Secretary's discretion.

[App'x at 1276.]

> In affirming the ALJ, the ARB observed that

> only upon receiving a J1 waiver is a nonimmigrant alien J1 visa holder eligible to obtain an H-1B visa.  Moreover, if a State health agency makes a request for a J1 waiver on behalf of a J1 visa holder, as was done for the nonimmigrant doctors here, the application process requires a "letter from the facility that wishes to hire physicians" and a "signed contract" with "signatures of [the] physician and head of the facility."  See Frequently Asked Questions, U.S. State Dep't, http://travel.state.gov/visa/temp/info/info_1294.html#types.  The record shows that either Kutty or his representative referred the doctors to a business, HealthIMPACT America, which would assist them in applying for a J1 waiver. [citation omitted].  Dr. Manole referred to HealthIMPACT as Kutty's "business partner."  HR at 298.  Kutty also filed letters and employment agreements with the Tennessee Department of Health in support of the doctors' applications for J1 waivers for the doctors he sought to hire.

> Again, since the Administrator is vested with enforcement discretion in assessing appropriate remedies and may impose remedies she deems appropriate, we hold that the Administrator's determination that the doctors were entitled to reimbursement of the J1 waiver costs was neither arbitrary nor an abuse of the Administrator's discretion.  See 20 C.F.R. § 655.810(e)(2).

[Citations omitted.]

We note that we understand the ARB's decision on the J1 waiver expenses to be based on the facts of this case and the propriety of the remedy based on those facts, and not a

determination that the Administrator has the discretion to treat J1 waiver expenses as business expenses of the employer in *every* case, regardless of the facts. We will not assume that the ARB would so decide, and leave that question to a case in which it is properly presented.

Under the circumstances presented here, the ARB's determination that the Administrator did not abuse its discretion or act arbitrarily in ordering reimbursement of the J1 waiver costs is supported by substantial evidence and is not contrary to law. Kutty's business plan contemplated the employment of nonimmigrant physicians under the H-1B program. It was not coincidence that all but one of the doctors, who happened to have a green card, were nonimmigrant physicians hired under contracts that made their employment contingent on their receipt of both an H-1B visa and a J-1 waiver. In addition, as the ARB observed, the record supports that in most cases, either Kutty or his in-house attorney pressured the physicians to hire HealthIMPACT, which apparently had some relationship to Kutty, to process their applications for the J1 waivers. Under these facts, the ARB's conclusion that the Administrator did not err in including the physicians' J-1 waiver application costs as a business expense is adequately supported.

## IV.

Kutty next challenges the imposition of personal liability on him for the back wages and penalties. He asserts that the INA does not provide authority to pierce the corporate veil and impose personal liability and that, even assuming such authority, Tennessee law would not support piercing the veil under these circumstances. We disagree.

## A.

Kutty asserts that the INA does not permit piercing the corporate veil because the statute addresses only violations by an "employer" and is silent with respect to personal liability. Although no case directly applies veil-piercing liability under the INA, in *United States v. Bestfoods*, 524 U.S. 51 (1998), the Supreme Court held that assuming the corporate veil may be pierced under applicable common-law principles, a parent corporation may be held responsible for its subsidiary's actions under the Comprehensive Environmental Response, Compensation,

and Liability Act (CERCLA).  *Id.* at 62–64.  CERCLA is silent, as is the INA, on the question of personal liability for an employer's violation.  The Court noted:

> CERCLA is thus like many another congressional enactments in giving no indication that the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute, and the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that in order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law.

*Id.* at 63 (alterations, citations, and internal quotation marks omitted).  Thus, where a statute is silent as to personal liability, *Bestfoods* permits a court to impose liability on the principal to the extent common-law principles permit.

We have similarly imposed individual shareholder liability for corporate violations of federal law where the statute does not explicitly mention personal liability.  In *Carter Jones Lumber Co. v. LTV Steel Co.*, we relied on *Bestfoods* to find that a shareholder could be personally liable under CERCLA, despite the statute's silence on personal liability, because *Bestfoods* "makes it clear that courts should continue to look to the common law to determine whether to hold a corporate shareholder personally liable for the acts of the corporation. . . ." 237 F.3d 745, 750 (6th Cir. 2001).  Using this analysis, we applied Ohio common-law to affirm the defendant shareholder's liability on the CERCLA claim.[7]  *Id.* at 750–51; *see also United States v. WRW Corp.*, 986 F.2d 138 (6th Cir. 1993) (applying Kentucky law in an enforcement action under the Federal Mine Safety and Health Act, holding that the corporate veil could be pierced to hold shareholders liable); *Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 384 (6th Cir. 1991) (using veil-piercing analysis in an Employee Retirement Income Security Act claim).

---

[7]Although *Bestfoods* left open the question whether state or federal common-law should govern these types of veil-piercing claims, this court in *Carter Jones* held that state common law principles should apply.  *Carter Jones*, 237 F.3d at 746 n.1; *see also Donahey v. Bogle*, 129 F.3d 838, 843 (6th Cir.1997), *vacated on other grounds,* 524 U.S. 924 (1998), *reinstated,* 16 F. App'x 283 (6th Cir. 2000) (holding in this CERCLA case that "federal courts must look to state law" when determining "the requisite standard for piercing the veil.").

Thus, because the INA is silent on individual personal liability, it does not preclude piercing the corporate veil if supported by the common law.  *See Carter Jones*, 237 F.3d at 750; *Bestfoods*, 524 U.S. at 62–63.

**B.**

Kutty further contends that the district court erred in its application of the Tennessee standard for piercing the corporate veil.  Under Tennessee law, because there is a presumption of corporate regularity, "[t]he principle of piercing the corporate veil is to be applied with great caution and not precipitately," and each case "must rest upon its special facts."  *Muroll Gesellschaft M.B.H. v. Tenn. Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995) (citation omitted).  However, corporate identity may be disregarded and the owners of the stock and assets may be treated as identical to the corporation "upon a showing that it is a sham or a dummy or where necessary to accomplish justice."  *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991) (citation omitted).  The "[c]onditions under which the corporate entity will be disregarded vary according to the circumstances present in the case, and the matter is particularly within the province of the [t]rial [c]ourt."  *Muroll Gesellschaft*, 908 S.W.2d at 213 (citation omitted).

Although no single factor is conclusive, *Schlater*, 833 S.W.2d at 925, Tennessee courts rely on the following factors when determining whether to pierce the corporate veil:

> Factors . . . include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Boles v. Nat'l Dev. Co., Inc.*, 175 S.W.3d 226, 245–46 (Tenn. Ct. App. 2005) (citing *Federal Deposit Ins. Corp. v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)); *see Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003).

The ALJ, ARB and district court did not err in concluding that a majority of these factors are present. Kutty set up a web of corporate entities, with the help of his attorney, in order to hire the nonimmigrant physicians. Kutty was the sole owner and investor in these entities. He made all the companies' major decisions regarding salaries and staffing from a single office in Florida, and he and his wife were the only officers and directors. There is no evidence that any of the corporations issued stock certificates and Kutty did not know whether they issued financial statements. Kutty treated the corporations as an extension of himself. The corporations appear to have been undercapitalized, as Kutty could not state how much money was used to start the clinics, or whether money was contributed as capital or loans.

In addition, there is support for the conclusion that the corporations were interchangeable and did not deal at arms length with each other. During the administrative proceedings, the ALJ found that, on various documents, multiple entities were represented as the employer of the same physician, and physicians that were employed by one corporation were often paid by another.[8] The ALJ noted that the documents signed by Kutty evidenced significant confusion with respect to "which corporate entities were acting as the H-1B physicians' employers."

Kutty cites cases supporting that several of the factors, standing alone, are insufficient to pierce the corporate veil.[9] However, these cases are inapposite because the record here supports

---

[8]The ALJ decision includes a chart depicting the overlapping relationships between the corporate entities and the physicians. As an example of how the entities were used interchangeably, the Secretary notes that Dr. Chicos's LCA lists "Sumeru Health Care Group" as his employer, but his paychecks were issued by "Sumeru Health Care Group, Inc." (a separate entity) and by "Center for Internal Medicine and Pediatrics, Inc.," his W-2 form was issued by "Center for Internal Medicine and Pediatrics, P.C.," and he was terminated by "Maya Health Care."

[9]*See* Kutty Br. at 27–30 (citing *Tenn. Racquetball Investors, Ltd. v. Bell*, 709 S.W.2d 617, 622 (Tenn. Ct. App. 1986) (finding that "mere dominance, standing alone," is insufficient to hold a corporate director responsible for corporate debts where control was not used to commit a fraud or wrong and the control did not proximately cause the injury complained of); *Capital Mgmt. Partners v. Eggleston*, No. W2004-01207-COA-R3-CV, 2005 WL 1606066, at *11 (Tenn. Ct. App. July 7, 2005) (unreported) (concluding that, although "some corporate formalities were disregarded during the early years of [the company's] existence," the company, which had a "cadre of experienced investors" who had "significant say in how the company was operated," was "anything but a sham or alter ego of [the company]"); *Schlater*, 833 S.W.2d at 925–27 (concluding that mere control or domination of a

the finding that nearly all of the factors are present and dispositive weight was not placed on any single factor.[10]

Kutty also argues that the corporate veil may not be pierced because the record does not support a finding of fraud.[11]  Tennessee law allows piercing of the corporate veil only where control over a corporation has "been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights."  *Cont'l Bankers Life Ins. Co. of the S. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979).  Here, the ALJ made—and the ARB affirmed—several findings that sufficiently qualify as "wrongs." Kutty and his medical clinics failed to pay the H-1B physicians the wages promised to them and required under the INA, 8 U.S.C. § 1182(n)(1)(A), including during periods in which the physicians were awaiting their credentials, in violation of the INA's "no-benching" provision, 8 U.S.C. § 1182(n)(2)(C)(vii)(I)–(IV) (requiring that H-1B employees be paid during periods of non-productivity due to a decision by the employer or due to the employees' lack of a license); and when the physicians complained, Kutty retaliated against them for engaging in protected conduct, 8 U.S.C. § 1182(n)(2)(C)(iv) (prohibiting employers from "discharg[ing] or in any other manner discriminat[ing] against an employee . . . because the employee has disclosed information . . . that the employee reasonably believes evidences a violation of this subsection").  The ALJ further found that "Kutty admitted that he knew he was not going to pay the physicians the amounts listed in the LCAs . . . despite having signed a

---

company was not sufficient to pierce the corporate veil, and further concluding that an inability to collect a debt owed by a corporation is insufficient to establish liability for the debt against its officers or shareholders)).

[10]Kutty argues that he owned all of the shares in the corporate entities in an attempt to comply with various provisions of the Tennessee Code, and therefore his organizational structure of choice "cannot be considered to work a fraud or injustice in contravention of public policy." Kutty's argument misses the point.  The ALJ did not hold Kutty personally liable merely because he exercised control over the companies.  Nothing in the statutory provisions Kutty cites suggest that the organizational structure of professional corporations precludes holding shareholders personally liable when otherwise appropriate under Tennessee Law. *See, e.g.*, Tenn. Code. Ann. § 48-101-606–08.

[11]The Secretary argues that Kutty waived the argument that the DOL failed to prove fraud by failing to raise it before the ARB.  However, Kutty argued before the ARB that he acted in good faith and that the fact that his clinics were unprofitable was not sufficient grounds to pierce the corporate veil.  This is essentially the same argument he makes here; thus there was no waiver.

declaration that the information on the LCAs was correct, and despite having signed an agreement to abide by the terms of the LCAs when he signed the H-1B petitions."

Kutty contends that the ALJ did not take into account that the physicians violated their employment contract by not working the requisite number of hours. However, the ALJ rejected this argument, finding that "there is little evidence of good faith efforts to comply with the law on the part of Dr. Kutty [and] his explanations provide inadequate justification for his actions." Under the INA and implementing regulations, Kutty was required to pay the rates specified in the LCA. Kutty neither paid the H-1B physicians the LCA rates, nor the (in many cases, lower) rates specified in the employment contracts and repeatedly promised to them. The INA is clear that Kutty was not permitted to withhold funds from the physicians except in limited circumstances, none of which were present here. *See* 20 C.F.R. § 655.731 (permitting wages to be withheld if an employee is nonproductive because of voluntary reasons unrelated to employment, if the employee has been rendered unable to work, or if there has been a bona fide termination of the employment relationship, in the event of which DHS must be notified and the employee must be provided reasonable transportation costs home).

Accordingly, because the record supports that nearly all of the Tennessee factors for piercing the corporate veil were present and the entities were used to commit a "wrong," we conclude that the ALJ did not err in deciding to pierce the corporate veil and hold Kutty personally liable.

## V.

Kutty's final argument is that the ALJ violated his right to due process by (a) allowing Kutty and Hooli, both non-lawyers, to represent Kutty and the corporate entities; (b) failing to postpone the hearing after Kutty was hospitalized and required surgery; (c) relying instead on Kutty's prior deposition and other testimony; and (d) finding Kutty personally liable in his absence. Kutty also asserts, generally, that the ALJ failed to adequately consider his arguments and explain her decision.

Kutty's due process claims lack merit. His argument that he and Hooli should not have been permitted to represent Kutty and the medical clinics because they were not licensed to

practice law fails because regulations governing ALJ hearings are clear that "[a]ny party shall have the right to appear at a hearing in person, by counsel, or by other representative . . . ." 29 C.F.R. § 18.34(a). The regulation permits "[p]ersons not attorneys" to appear in a representative capacity in adjudicative proceedings provided they apply prior to the hearings or to the ALJ at the commencement of the hearing. *Id.* at § 18.34(g). Here, after Kutty's counsel was granted permission to withdraw, the ALJ postponed the hearing to give Kutty time to find new counsel and asked Kutty whether he would like to seek legal representation. Kutty opted to represent himself, as was his prerogative. Thus, Kutty received due process.

Nor did the ALJ violate Kutty's due process rights by failing to postpone the hearing when Kutty was hospitalized. Kutty was represented by counsel at the time of his hospitalization, and the attorney noted that Kutty wished the hearings to proceed in his absence, a fact that Kutty does not dispute.[12] Further, the ALJ did not violate Kutty's due process rights by relying on Kutty's prior deposition testimony. The regulations governing ALJ hearings permit the depositions of parties or authorized agents of a corporation to be used "by any other party for any purpose." 29 C.F.R. § 18.23(a)(3). The depositions of witnesses may also be used when they are unavailable to testify due to illness. *Id.* at § 18.23(a)(4)(iii).

Kutty's claim that liability cannot be assessed against him in his absence also fails. Kutty did, in fact, appear at the hearings in early June and again when they resumed in December, when he made a closing statement to the ALJ. Both the substance of that closing statement and the fact that Kutty was there to make it, undermine the due process claims he now makes.

Finally, Kutty's suggestion that the ALJ violated his due process rights by failing to consider Kutty's argument that the physicians were not living up to their end of the bargain is unavailing. The ALJ's 104-page decision demonstrates thoughtful and careful consideration of the issues, including specific consideration of Kutty's claims that the physicians were breaching their employment contracts. (*See* ALJ Decision, Appx. at 1276–79 (crediting Kutty's testimony that he believed the doctors were not working hard enough, but finding that Kutty had

---

[12]The Secretary also provides evidence contradicting Kutty's claim that he did not attend the hearings because he was ill all summer; Kutty's medical records suggest he traveled to India for vacation after his hospitalization.

"unreasonable expectations and exaggerated isolated incidents in an attempt to scapegoat the doctors for problems with administration of the clinics").). Accordingly, we find that Kutty's due process claims are meritless.

**VI.**

For the foregoing reasons, we AFFIRM.