NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0437n.06

No. 15-5788

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

SUMERU HEALTH CARE GROUP, L.C., dba The Center for Internal Medicine and Pediatrics,

  Plaintiff-Appellant,

v.

MICHAEL T. HUTCHINS, Individually and as Administrator of the Claiborne County Hospital; CLAIBORNE COUNTY HOSPITAL; BAPTIST HEALTH SYSTEM OF EAST TENNESSEE, INC.,

  Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Aug 01, 2016
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

---

**BEFORE: NORRIS, McKEAGUE and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Plaintiff Sumeru Health Care Group operated medical clinics in East Tennessee that were staffed by foreign physicians under a federal visa-waiver program. Sumeru brought this action against Defendant Claiborne County Hospital ("CCH") and two affiliates after the clinics failed. While the case was pending in the district court, Sumeru's owner challenged a Department of Labor decision imposing penalties for actions taken with respect to Sumeru's employment of the foreign physicians. After this court upheld the Department of Labor ruling, *Kutty v. Department of Labor*, 764 F.3d 540 (6th Cir. 2014), Defendants moved for summary judgment, arguing Sumeru's claims are precluded by findings from the Department of Labor litigation. The district court agreed, and we **AFFIRM**.

## I. Background

### A. Facts

This case arises out of Sumeru's establishment and operation of medical clinics in East Tennessee between 1998 and 2001. Mohan Kutty, a Florida-based internist, began exploring opportunities for expanding his practice in the late 1990s, and learned of a visa-waiver program for foreign physicians who practice in medically underserved communities. Kutty decided to set up a group of fee-for-service clinics in medically underserved East Tennessee and created Sumeru.

Sumeru opened its first clinic in Maynardville, Union County, in July 1998, and planned to open additional clinics in Hawkins and Claiborne Counties. At the time, Kutty had not yet decided where to locate Sumeru's Tennessee base of operations, which would house the group's specialists—a key element of the Sumeru business model. According to Sumeru, Kutty's plan was for low-revenue primary-care physicians at the Sumeru clinics to develop a base of patients for referral to Sumeru specialists, including a cardiologist, who would generate profits for the group by conducting testing on-site, using Sumeru equipment. The base of operations had to be located near a hospital, where the cardiologist could refer patients for emergency and in-patient care. The Maynardville clinic could not serve as the base of operations because Union County did not have a hospital.

According to Sumeru, Kutty initially planned to establish the base of operations at a clinic in Tazewell, Claiborne County, but had trouble obtaining admitting privileges at the local hospital—Defendant CCH—for two of its physicians, allegedly because they are from India. Thus, Kutty decided to establish Sumeru's base of operations at a clinic in Rogersville, Hawkins County, where the local hospital would grant privileges.

Against this backdrop, Kutty sent letters to the local hospitals, including CCH, in early July 1998 to seek support for the clinics—mainly, assistance bringing in physicians through the visa-waiver program. The CCH letter was addressed to Defendant Michael Hutchins, CCH's administrator. Hutchins was employed by Defendant Baptist Health Systems of East Tennessee ("Baptist"), and administered CCH through an agreement between CCH and Baptist. According to Sumeru, Hutchins did not respond to Kutty's letter, but after Sumeru decided to assign two Romanian doctors to Rogersville rather than Tazewell, Hutchins called Kutty "straight out of the blue" and asked him to reconsider. R. 43-14, Kutty Dep. at 198. Kutty told Hutchins that he would not bring physicians to Tazewell unless CCH would grant privileges to all of Sumeru's physicians, including the Indian doctors, but agreed to meet with Hutchins to discuss Sumeru's business plan.

Kutty then met with Hutchins and other CCH leaders for the first time in early 1999. At this meeting, which took place at CCH, Kutty explained that he planned to open a group practice staffed by foreign physicians, including a clinic in Tazewell, and requested official support for visa waivers, as well as assistance in working out an arrangement for Sumeru's physicians to work in CCH's emergency room. Sumeru claims that Hutchins and Kutty worked out a deal for Sumeru to locate its cardiologist and other physicians in Tazewell, rather than Rogersville. According to Sumeru, CCH and Kutty agreed that CCH would not actively divert cardiology work, like echocardiograms, from Sumeru, or acquire new cardiology equipment, and that Sumeru would not compete with CCH for lab work, X-rays, MRIs, and CTs. Further, CCH would grant hospital privileges to Sumeru's non-Indian physicians.

Sumeru opened the Tazewell clinic in February 2000. Kutty initially staffed the clinic with three internists and a cardiologist, all salaried. Sumeru's physicians also worked at CCH's

emergency room under an agreement that CCH brokered with its emergency-services provider; payment for the Sumeru physicians' emergency-room work went directly to Sumeru, not to the doctors. The foreign physicians also began admitting patients and performing procedures at CCH; payment for these services also went directly to Sumeru.

By early 2001, Kutty and his administrator, Basavaraj Hooli, began to suspect that the foreign physicians were shirking their contractual obligations to Sumeru by working insufficient hours at the Tazewell clinic, and by performing basic diagnostic and evaluative medical work at CCH that could have been done at the clinic—depriving Sumeru of revenue. Kutty later testified that he believed the Sumeru physicians were moonlighting at CCH outside of their contracted emergency-room work and earning independent income.

Dissatisfied with the physicians, Sumeru began cutting their salaries in December 2000 and January 2001. Eight of Sumeru's physicians hired an attorney, who sent Kutty a letter in February 2001. Sumeru stopped paying the complaining physicians. The physicians filed a complaint with the Department of Labor on February 28, 2001, alleging Kutty had violated federal law by withholding their salaries. Sumeru fired seven of the complaining physicians, and several other physicians quit. The Tazewell clinic closed, and Sumeru went out of business within the year. The Tazewell physicians all found other work; none took positions directly with CCH, although some stayed in the area.

**B. Procedural History**

Sumeru brought this action against CCH and Hutchins in August 2002, and later amended its complaint to name Baptist as a defendant. In the amended complaint, Sumeru brought four state-law claims against Defendants for their alleged roles in the collapse of its East Tennessee medical-clinic business: tortious interference with prospective business relationship

(Count I); fraud, fraudulent and/or negligent misrepresentation (Count II); breach of implied contract/breach of implied duty of good faith and fair dealing (Count III); and unfair competition (Count IV).

In Count I, Sumeru claimed Defendants tortiously interfered with Sumeru's prospective business relationship with the Sumeru physicians by "inducing and providing financial incentives" for Sumeru's physicians to breach their contracts, to improperly refer patients to CCH for procedures that could be done at the Tazewell clinic, and to bill through CCH rather than Sumeru. In Count II, Sumeru asserted Defendants fraudulently induced Sumeru to open clinics in East Tennessee in order to entice Sumeru's physicians to leave Sumeru and contract with CCH. In Count III, Sumeru alleged Defendants impliedly contracted with Sumeru not to "induce, entice or encourage" the physicians to breach their employment agreements with Sumeru, and that Defendants breached their duties under this implied contract by offering the physicians financial incentives to breach their employment agreements. R. 35, Am. Compl. ¶¶ 43–44. Lastly, in Count IV, Sumeru asserted Defendants engaged in unfair competition by "seeking to monopolize all physicians in the Claiborne County area" and inducing the physicians to breach their employment contracts. *Id.* ¶¶ 47–48.

At the time the action was filed, the Department of Labor had already begun investigating the physicians' February 2001 complaint against Kutty and his businesses, including Sumeru. An employer seeking to hire physicians through the visa-waiver program must file a Labor Condition Application (LCA) with the Department of Labor setting the wage rates and working conditions for the prospective employees. 8 U.S.C. § 1182(n)(1)(D). Once the Department of Labor certifies the LCA, the employer must comply with the specified wages and conditions. *Id.* § 1182(n)(2). In April 2001, the Administrator of the Wage and Hour Division determined that

Kutty willfully failed to pay LCA wages, improperly withheld LCA documents, failed to maintain payroll records, and retaliated against the physicians for engaging in protected conduct. The Administrator authorized back wages and civil penalties.

Kutty appealed the Administrator's decision to a Department of Labor administrative law judge (ALJ). The ALJ conducted sixteen days of hearings in June and December 2001. In October 2002, the ALJ issued a 102-page decision and order addressing ten issues, which included extensive findings of fact and conclusions of law. The ALJ affirmed the Administrator's determination that Sumeru had failed to pay required wages and had retaliated against the physicians. The ALJ ordered payment of $1,044,294 in back wages and assessed civil penalties of $108,000. The ALJ also pierced the corporate veil and held Kutty personally liable. Kutty appealed to the Administrative Review Board (ARB), which affirmed the ALJ in all respects.

While the administrative proceedings were underway, the instant damages action continued in federal court. In July 2005, Defendants moved for summary judgment on nine different grounds, including that Sumeru was collaterally estopped from re-litigating issues decided by the ALJ in the Department of Labor proceeding. On Sumeru's motion, the district court stayed the proceedings while Kutty sought judicial review of the ARB's decision. The district court upheld the ARB decision and this court affirmed. *Kutty v. U.S. Dep't of Labor*, No. 05-CV-510, 2011 WL 3664476 (E.D. Tenn. Aug. 19, 2011), *aff'd*, 764 F.3d 540 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 1162 (2015).

Defendants notified the district court of the final disposition of the Department of Labor litigation, and the parties submitted further briefing on Defendants' pending motion for summary judgment. The district court then granted summary judgment to Defendants, concluding that the

issues had already been litigated in the Department of Labor proceedings and thus Sumeru's

claims were barred under the doctrine of issue preclusion.

## II. Discussion

We review de novo the district court's issue-preclusion determination. *Georgia-Pacific*

*Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1097 (6th Cir. 2012). Under

the doctrine of issue preclusion, "the determination of a question directly involved in one action

is conclusive as to that question in a second suit." *B & B Hardware, Inc. v. Hargis Indus., Inc.*,

135 S. Ct. 1293, 1302 (2015) (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 354 (1877)). We

employ a four-part test:

> 1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;
> 2) determination of the issue must have been necessary to the outcome of the prior proceeding;
> 3) the prior proceeding must have resulted in a final judgment on the merits; and
> 4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 (6th Cir. 2003).

On appeal, Sumeru concedes that most of the instant lawsuit is foreclosed by the ALJ's

finding that the physicians fulfilled their obligations to Sumeru and did not breach their

contracts. Sumeru's counsel clarified at oral argument that the only damages now sought in the

litigation are "up front" expenses—the costs incurred by Sumeru in locating a clinic at Tazewell

and hiring the foreign physicians, for example. Oral Arg. at 10:36–11:37. Thus, Sumeru's

appellate argument focuses on representations allegedly made by Hutchins to induce Sumeru to

locate a clinic at Tazewell, and the alleged agreements between Kutty and Hutchins resulting

from those representations. *Id.* at 12:08–12:25.

To the extent these arguments are in the complaint, the claims are foreclosed by the ALJ-determined facts. The inducement issue Sumeru raises on appeal was plausibly alleged only in Count II (misrepresentation) and Count III (breach of implied contract). As alleged in Count II, Defendants represented that Sumeru and CCH "could work together to increase the quality of health care" in the area, but that Defendants' "sole basis . . . to induce the Plaintiff to open its clinics" was "to allow the Claiborne County Hospital to entice the Contracted Physicians already relocated to the area to leave the Plaintiff's business and contact [sic] with the Claiborne County Hospital or affiliated entities." R. 35, Am. Compl. ¶ 40. In Count III, Sumeru alleged Defendants "impliedly contracted with the Plaintiff" that they "would not engage in any action that would induce, entice or encourage the Contracting Physicians to breach their employment agreement with the Plaintiff." *Id.* ¶ 43.

However, both counts are premised on the physicians breaching their contracts with Sumeru, the precise issue already decided by the ALJ. In Count II, Sumeru alleged that Defendants' representations were fraudulent because Defendants "caused the Contacted Physicians [sic] to breach their contractual agreements with the Plaintiff." *Id.* ¶ 40. If the physicians did not breach their contracts, Sumeru cannot recover on this claim. Count III alleged that Defendants "offer[ed] the Contracted Physicians financial incentives to breach their employment agreements." *Id.* ¶ 44. If the alleged implied contract was an agreement not to induce a breach of the physicians' contracts, the ALJ's findings foreclose that claim as well.

Specifically, the ALJ found that the physicians fulfilled their duties under their Sumeru contracts, worked at hospitals under Kutty's direction, and earned no outside income from CCH. For example, the ALJ found:

> Several doctors worked in emergency rooms, but all testified that they did so at the request of Dr. Kutty, and that payment for their services went to the clinics.

> Their testimony is corroborated by the paperwork in evidence. . . . Billing and payment records also show that payments were made to the clinics, and not to individual doctors. Dr. Kutty testified that he expected that some of the patients the doctors treated at the emergency room would become their regular patients. Some of the doctors also testified about additional services they provided to local hospitals, with official sounding titles, but without any additional pay, as part of their practice for the clinics.

R. 43-2, D&O at 16. The ALJ also explained:

> I do not credit Mr. Hooli's and Dr. Kutty's professed belief that the doctors were working less than 40 hours per week. Both testified that only work in the clinic, and not work in an emergency room, at the hospital or in nursing homes, should be counted toward the 40 hours, despite overwhelming evidence that such work was undertaken at Dr. Kutty's specific direction, and was necessary to the practice of medicine for the clinics. Allegations that the doctors were paid by third parties for moonlighting or were working out of status during the time they were obligated to work only for Respondents are not supported by the evidence.

R. 43-8, D&O at 72. The ALJ also detailed the circumstances of the seven physicians assigned to the Tazewell clinic and found that they complied with their contracts. *See* R. 43-4, D&O at 35–41 (Venkatesh); R. 43-5, D&O at 41–45 (Speil); *id.* at 45–47 (Chicos); *id.* at 47–51 (Naseem); R. 43-6, D&O at 51–52 (Casis); *id.* at 52–55 (Radulescu); *id.* at 55–56 (Kanagasegar).

Sumeru argues Hutchins induced Kutty to locate his main clinic at Tazewell by agreeing not to actively divert cardiology work from Sumeru or acquire new cardiology equipment, and that after Sumeru located in Tazewell CCH breached the agreement by inducing Sumeru's cardiologist—Dr. Shoiab Naseem—to perform tests at CCH, rather than at the Sumeru clinic. But Kutty asserted in the Department of Labor proceedings that he was justified in withholding Naseem's salary because Naseem was improperly performing cardiology work at CCH. The ALJ rejected this claim, instead crediting Naseem's testimony that he could not perform basic cardiology tests at the Tazewell clinic because the equipment was inadequate.

We conclude that all four prongs of the issue-preclusion test are satisfied. The "precise issue raised in the present case" was "raised and actually litigated in the prior proceeding"; the

ALJ's findings about the physicians' conduct while employed by Sumeru were "necessary to the outcome of the prior proceeding"; the parties agree that the Department of Labor proceeding "resulted in a final judgment on the merits"; and, Kutty "had a full and fair opportunity to litigate" the issues. *Cinemark*, 348 F.3d at 583. Kutty himself raised and litigated these issues as a defense in the ALJ proceedings.

### III. Conclusion

Because Sumeru's claims rest on precluded issues, we **AFFIRM** the district court's grant of summary judgment to Defendants on all counts.